UNITED STATES of America,
Plaintiff-Appellee,

v.

Mort Christopher GOODMAN,
Defendant-Appellant.

No. 26767.

United States Court of Appeals,
Ninth Circuit.

Feb. 24, 1972.

Certiorari Denied May 30, 1972.
See 92 S.Ct. 2073.

Lawrence W. Steinberg (argued), Beverly Hills, Cal., for appellant.

Gregory C. Glynn, Asst. U. S. Atty. (argued), Robert L. Meyer, U. S. Atty., Eric A. Nobles, Chief, Criminal Division, Los Angeles, Cal., for appellee.

Before CARTER and HUFSTEDLER, Circuit Judges, and BATTIN,* District Judge.

BATTIN, District Judge:

Defendant appeals from conviction on seven counts of a nine-count indictment charging him with counterfeiting and conspiracy in contravention of 18 U.S.C. §§ 371, 485, 487, and 490.

Appellant maintains that the evidence introduced at trial was not sufficient to sustain a prima facie finding of conspir-

---

* Honorable James F. Battin, United States District Judge, District of Montana, sitting by designation.

acy and was not sufficient to support conviction for conspiracy or for the substantive counts charged. The evidence reveals that Gray, a co-defendant, obtained sheets of silver. Appellant had these silver sheets rerolled to a thickness which approximated the strip thicknesses of U.S. coins prior to manufacture. Appellant also arranged for the purchase of punching dies to punch out slugs. These were ordered in the sizes of dimes, nickels, quarters and fifty-cent pieces. Appellant obtained a coining collar in the size of a dime. This collar had 120 serrations. A real dime has only 118 serrations. The counterfeit 1942 over 1941 Mercury head dimes introduced into evidence contained 120 serrations. Appellant also obtained coining dies in the approximate size of dimes and pennies. Appellant arranged for the purchase of an upset mill and four shoes for this mill in the size of a silver dollar, a fifty-cent piece, a quarter, and a dime. Appellant obtained a small coining press to be used to punch planchets out of metal strips and to form designs on those planchets for medallions or similar articles. Appellant left a die and a collar set with the manufacturer of the press to enable him to produce the press for his purposes. These dies were very close in size to either a penny or a dime.

Appellant also obtained an Agietron electrical discharge machine (e. d. m.) from Alina Corporation. Personnel from Alina trained Goodman in the operation of the e. d. m. The function of an e. d. m. is to imprint on a die or other metallic object an image found on a coin or similar raised metallic object by a spark-gap operation of electricity.

Gray arranged for the sale of 1942 over 1941 Mercury head dimes. These dimes were counterfeit and were prepared from the same dies as the other counterfeit 1942 over 1941 dimes in evidence. One Raymond, at the request of Gray, sold other 1942 over 1941 counterfeit dimes. He also sent 297 of these dimes to Gray at a post office box in the Los Angeles area. This post office box had been rented shortly before. The application was signed by appellant and both he and Gray were entitled to receive mail through that box.

Appellant issued a certificate of authentication of a 1969 double die penny. He stated on the witness stand that he did not perform the tests which the certificate indicated that he had performed. Moreover, he obtained a certification from Gary Young, a professional numismatist, on the basis of his representation to Young that he had performed these tests. Appellant told Young that he had obtained the two 1969 double die pennies from a person who lived in the East. Appellant also represented that there were additional 1969 double die pennies in the possession of the person from whom he had obtained the two samples. Appellant also contacted Maurice M. Gould, a syndicated columnist, and attempted to have him do a story on the 1969 double die pennies.

Robert Teitelbaum, a rare coin collector, met defendant Gray who gave him three 1969 double die pennies. Gray told Teitelbaum that these coins had been authenticated and that there would be publicity in coin publications concerning them. Gray also arranged for Walter Breen, a professional numismatist, to receive one of the 1969 double die pennies.

Gray asked Teitelbaum to attempt to find buyers for the 1969 double die pennies. Teitelbaum telephoned appellant's home in the presence of Martin Holland and asked appellant if he would like to see a 1969 double die penny, since he had authenticated some others. Appellant replied that he would and stated that he had tried to buy the ones which he had authenticated. Teitelbaum and Holland went to appellant's house, where appellant purchased the 1969 double die penny from Teitelbaum for $100. He also gave Teitelbaum a written receipt. As a result, Teitelbaum sold 2300 1969 double die pennies to Sam Jowdy for $92,000. These pennies were counterfeit and were identical to the 1969 double die pennies in evidence. They were produced from the same set of dies which were made by an e. d. m. process.

Teitelbaum turned over the $92,000 in checks from Jowdy to Gray. Gray gave Teitelbaum and Holland 85 coins and asked them to put them in circulation in Washington. Gray also asked Teitelbaum to get Gray the name of a reliable person in Washington to write a letter to appellant which would state that he had found two coins in circulation and to request appellant to authenticate them for him. The letter was to be pre-dated by three to four weeks. Teitelbaum turned the 85 coins over to the United States Secret Service at a later date. Two days later, Gray told Teitelbaum that he needed an alibi for appellant. He requested the name of a person in Washington. The Secret Service furnished Teitelbaum with a name— "Bob Gottesman, 123 Rockridge Lane, Woodbridge, Virginia." Teitelbaum furnished this name to Gray. Shortly thereafter, appellant told an agent from the Secret Service that he had received the two 1969 double die coins which he had authenticated from Bob Gottesman, who lived in Virginia and worked in Washington.

Appellant also told the Secret Service agent that he had taken the coins to Magnaflux Corporation for testing. An employee of Magnaflux testified that the lab had run tests on other coins brought to it by appellant, but that it had not run any tests on a 1969 double die penny for appellant.

Secret Service Agent Miller conducted experiments in which he produced, by use of an e. d. m., dies for making a 1942 over 1949 Mercury dime and a 1969 double die penny. From these dies, Agent Miller produced a 1969 double die penny and a 1942 over 1941 Mercury dime. Miller had written authorization from the Director of the Secret Service to manufacture these dies and coins. Neither appellant nor Gray had this authorization.

A review of the evidence clearly substantiates a prima facie finding of conspiracy and supports the convictions for conspiracy and the other substantive counts.

Appellant claims that the pre-instruction on conspiracy was reversible error because it allowed the jury to consider appellant's financial stake in the venture as a factor in determining whether a conspiracy existed, and whether appellant was a member of it. This reference to financial stake in the venture was omitted in the final instruction to the jury. Appellant's theory is that the pre-instruction allowed the jury to infer guilt from the financial interest of appellant in a "legitimate" venture. This argument is without merit.

Appellant argues that it was error for the trial judge to deny him the opportunity to introduce evidence to show that genuine double die pennies did in fact exist. The trial court properly denied admission of this evidence, since it went to Philadelphia Mint pennies and not the San Francisco Mint double die pennies which were in evidence. The existence of genuine double die Philadelphia Mint 1969 pennies was merely a collateral issue.

Appellant claims that denial of continuances, sought during trial, was prejudicial to his defense. These continuances were sought by counsel because of his fatigue and mental distress. The record reveals that the trial court advised defense counsel that a continuance would be granted if his physician appeared and testified to his inability to proceed. His physician did not appear.

Grant or denial of a motion for continuance rests in the sound discretion of the trial court. United States v. Ellenbogen, 365 F.2d 982, 985 (2nd Cir. 1966). Review of the record does not reveal an abuse of this discretion.

Appellant claims that the trial court rulings on discovery and the untimely compliances by the Government with these rulings prejudiced him in his defense. The trial court ordered the United States to furnish appellant with all evidence favorable to him for inspection, copying or photographing, by May 15, 1970. The court also ordered that all material coming within the Jenks Act be

furnished to appellant at least 36 hours before the testimony of the witness involved. The affidavit, required of the Government, stating that the evidence favorable to appellant had been furnished, was not filed until July 2, 1970. In some cases, this order was not complied with, apparently through inadvertence.

■■ The failure of compliance by the Government with the order of the court with regard to the Jenks Act material was remedied by allowing defense counsel to examine the Jenks Act material after the witness had testified. Thus, no prejudice resulted to the defendant. Moreover, this is all that is required by 18 U.S.C. § 3500. The late submission of evidence favorable to appellant by the Government did not prejudice him.

■ Information regarding scientific experiments, which the court had required the Government to release to appellant, was in two instances not furnished to appellants at the time required.

Again, however, appellant was not prejudiced by this delay, since his counsel was given ample time to examine the information before cross-examination.

■ Appellant claims that he was denied due process by failure of the court to make its own determination of what documents were discoverable, when it placed that decision in the discretion of the United States. This argument is without merit. The court had before it all of the official Government case reports for its examination and ruled that the Government had furnished everything that was required.

■ Appellant claims that it was error for the court to require him to make objections to the pre-instruction and to the final instructions in the presence and hearing of the jury. With regard to the pre-instruction, the court asked appellant's counsel if he had any objection. He stated that he did, but was unable to state it specifically. The court

heard the objection, after a recess, out of the presence of the jury. With regard to the final instructions, the court held a lengthy conference outside the presence of the jury before instructions were given. Counsel were advised that it would be necessary to state objections to the instructions after they were read to the jury. To save time before the jury, counsel were advised that after the giving of the instructions, they could incorporate objections previously made. Thus, after the instructions were given, the court asked if there was objection. Appellant's counsel stated that his objections were as previously indicated.

Appellant's objection to this procedure is that the final impression of appellant left with the jury is one of disagreement with the court, whom the jury regards as an impartial arbiter.

No prejudice appears from the procedure used with regard to the pre-instruction, since appellant only indicated that he had an objection to that instruction, and this objection was heard out of the presence of the jury. With regard to the final instructions, this court has approved the practice of having incorporation by reference of objections after oral delivery of instructions. Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 744–745 (9th Cir. 1954). The fact that the incorporation by reference of objections was made within the hearing of the jury, rather than at the bench as in *Las Vegas,* does not require reversal, since no prejudice was shown.

■ Appellant claims that the handling of a note sent by the jury to the court constituted reversible error. The note requested appellant's testimony when he was on the stand. Without conferring with counsel or with appellant, the court learned from the court reporter that it would take between two and three hours to reread appellant's testimony. The court then sent a note to the jury asking whether it was necessary to read all of appellant's testimony or whether the request could be nar-

rowed to specific portions or subject-matters. The jury then responded by stating that they were interested in the portions of the testimony with regard to dimes that were sent to the post office, who picked them up, where they were taken, and whether they were opened and by whom. The court then advised appellant and counsel of the situation and learned that appellant had not testified with regard to the dimes sent to the post office box. The jury was then brought into the courtroom and advised of this fact. The court asked the jury whether this answered their inquiry and the Foreman responded that it did. They were then returned to the jury room and no further request for re-reading of testimony or other information was made. Appellant maintains that both the sending of the note by the court to the jury and the failure to furnish information concerning the disposition of the dimes sent to the post office box constituted error. These claims are without merit. The sending of the note to the jury by the court constitutes a mere procedural irregularity and does not require reversal. United States v. Compagna, 146 F.2d 524, 528 (2nd Cir. 1944). Moreover, if any possible prejudice resulted, it was cured when the jury was brought into the courtroom and questioned by the court, in the presence of counsel and appellant, with regard to their request. The jury indicated, upon questioning, that their request had been answered. They made no further requests for information.

 Appellant claims that it was error for the court to instruct the jury that they could assume for the sake of argument that no 1969 double die penny was ever validly issued from the Mint. Appellant's claim is that the jury was never advised to withdraw or retract this assumption and that this caused considerable damage to his defense. The instruction of the court, however, was valid. The court merely advised the jury that the question of whether any 1969 double die pennies had validly been issued by the Mint was not important.

The issue was whether appellant was guilty of the crime of forging or counterfeiting a coin or knowingly passing or selling a counterfeit coin with intent to defraud.

 Appellant claims that the court questioned him in a sharp manner, indicating its disbelief in his testimony, and that this was prejudicial and damaging to his case. The example cited by appellant revealed an attempt by the court to develop the facts of the case, not an attempt to belittle or prejudice appellant. This claim has no merit. Smith v. United States, 305 F.2d 197, 205 (9th Cir. 1962).

 Appellant claims that Count Nine of the indictment failed to charge a crime, because it did not charge the essential element that the coins in question were false or counterfeited. The indictment alleges that on or about May 20, 1969, in the Central District of California, defendants, with intent to defraud, did pass, utter, publish and sell 2300 copper coins in resemblance and similitude of general copper coins which have been coined in the Mints of the United States, namely, one cent coins. The test of the sufficiency of an indictment is whether it (1) has all elements of the offense charged; (2) properly apprises defendant of what he must meet in preparation of defense; and (3) enables him to plead double jeopardy in subsequent prosecutions. Hagner v. United States, 285 U.S. 427, 431, 52 S. Ct. 417, 76 L.Ed. 861 (1932). When the indictment is taken as a whole, it is clear that items (2) and (3) are met. The omission of the words "counterfeited" and "false" does not eliminate the charging of the element that the coins be other than United States Minted coins. The use of the words "in resemblance and similitude of general copper coins which have been coined in the Mints of the United States, namely, one cent coins" is sufficient to charge the element of counterfeiting in accordance with 18 U.S.C. § 490.

Affirmed.