UNITED STATES of America,
Plaintiff-Appellee,

v.

George H. LUSTIG, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gregory D. PEDERSON,
Defendant-Appellant.

Nos. 76–2661, 76–2752.

United States Court of Appeals,
Ninth Circuit.

June 15, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 12, 1977.

Phillip P. Weidner, Drathman, Weidner, Pope J. Lindsley, Anchorage, Alaska, argued, for appellant Lustig.

Fredrick P. Pettyjohn, Anchorage, Alaska, argued, for appellant Pederson.

G. Kent Edwards, U.S. Atty., Anchorage, Alaska, argued, for plaintiff-appellee.

Before CARTER, TRASK and KENNEDY, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

This is an appeal from jury convictions for distribution of a controlled substance (cocaine), in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846. Appellant Pederson was also convicted of possession of a controlled substance, in violation of 21 U.S.C. § 844.

Appellant Lustig has raised numerous contentions. In particular, he argues that the judge improperly dismissed a juror, that he should have been granted a continuance after he obtained new counsel, and that the testimony of his common law wife was received in violation of the marital privilege. Appellant Pederson argues only that his right against self-incrimination was violated by being forced to answer certain questions on cross-examination.[1] Finding none of these claims meritorious, we affirm.

## FACTS

Appellant Pederson met undercover police detective Bernard Lau on February 27, 1976, in order to sell him an ounce of cocaine. The meeting was arranged by Mike Tarnef, a local dealer turned informant. Prior to this meeting, Pederson picked up a small package (presumably containing the cocaine) from a man identified by four police officers as appellant Lustig. Pederson told Tarnef that his "man", or narcotics source, was Lustig.

After the February 27 meeting, Pederson told Lau that more drugs were available for purchase. Pederson telephoned Lustig immediately after this conversation. (Telephone records indicate extensive communications between Pederson and Lustig.) Lau gave Pederson and his wife (and co-defendant) Sherri Pederson some money the next day to buy the drugs and to repay a debt Pederson said he had with his source. It was established that Pederson owed money to Lustig.

Prior to the second meeting with Lau, the Pedersons drove out to Lustig's home located in Wasilla. Their vehicle rendezvoused with another near Lustig's home and then returned to Anchorage. The Pedersons then went directly to the meeting with Lau and sold him another ounce of cocaine.

Appellants were arrested on March 11. Lustig was stopped near his home while

---

1. Appellant Pederson does, however, adopt the arguments of Lustig on appeal, as is his right under Fed.R.App.P. 28(i).

driving a truck. It was searched for inventory purposes, and a "seal-a-meal" bagging machine later identified as the same used for packaging the cocaine sold to Lau was found.[2] The truck also contained an unused "seal-a-meal" bag and drug-weighing scales.

Lustig was informed of his rights and placed in a police car. Enroute to the federal marshal, the arresting officers found two ounces of cocaine in Lustig's possession. Lustig had attempted to conceal this cocaine under the rear seat of the car.

Appellants were indicted (in a superseding indictment) on March 24. Lustig initially was represented by attorney William Fuld, who handled the arraignment proceedings and filed numerous pretrial motions on Lustig's behalf. The district court, informed that Lustig might attempt to post bond and then flee, froze Lustig's assets and restrained Lustig from disposing of his assets. In the meantime, Lustig was rearrested on a prior Alaskan drug offense on a petition to revoke probation and held without bail.[3]

Lustig obtained new counsel four days before the scheduled trial date. The court had urged Lustig, a month earlier, to finalize arrangements with an attorney to insure proper representation. The new counsel made an unsuccessful motion for a continuance, and then petitioned this court for a writ of mandamus or prohibition staying the trial in order to provide more preparation time. This petition was denied on April 26, 1976.

Trial began on April 27. After one day of testimony, the court informed counsel that one juror had been excused because he admitted prejudicial knowledge about the

case. A motion for mistrial because of this excusal was denied.

Lustig testified in his own behalf. He said he felt it was an infringement on his liberty for the government to proscribe the use of cocaine. He admitted to possession of the drug, but said it was for his own use. He denied that the sealing machine and other paraphernalia belonged to him. Lustig also claimed that the police were mistaken in their identification of him as the supplier of the drugs to Pederson.

Pederson also testified in his own behalf. He admitted participating in the February 25 and March 4 transactions, but claimed entrapment. He denied that Lustig was the man who supplied him with the cocaine.

The government called Lustig's common law wife, Callie Newton, as a rebuttal witness. She testified there was a verbal agreement between Lustig and Pederson to distribute cocaine. Lustig objected on the ground that this testimony violated his marital privilege. The district court allowed the testimony because Alaska law does not recognize the validity of common law marriage. Lustig claims that Newton's testimony was given because of a desire for revenge arising out of certain unrelated events. The defense sought a continuance during trial to subpoena an independent witness to establish Newton's improper motives. This request was denied.

After 12 hours of deliberations, the jury returned verdicts of guilty on all counts. Motions by Lustig for different verdict forms and for individual polling of jury members on each count were denied. Lustig was sentenced to nine years; Pederson received seven. This appeal followed.[4]

2. Experts testified that the "seal-a-meal" bag was a unique packaging method for cocaine. Tests conducted on the device found in Lustig's truck showed that it left a characteristic marking on the bags it sealed identical to that on the bags sold to Lau and to a bag found in Lustig's possession on the day of his arrest.

3. Lustig characterizes himself as a "political activist who has incurred the wrath of the United States government." He was convicted in 1968 for possession and distribution of mari-

juana. He was peripherally involved in the litigation which ended with the Alaska Supreme Court declaring that possession of marijuana for personal use was constitutionally protected. *See Ravin v. State*, 537 P.2d 494 (Alas.1975). However, Lustig neither specifically argues nor makes out a claim of official harassment.

4. After Lustig was convicted and sentenced in this case, his probation was revoked for the prior Alaska offense and his original five-year

## MOTIONS FOR CONTINUANCES

 Lustig was represented by attorney Fuld from the time of his arrest until four days prior to trial. Fuld moved to withdraw as counsel two weeks after Lustig's arrest, claiming the period prescribed by the Speedy Trial Act made representation by anyone impossible. The district court denied Fuld's motion, but warned Lustig that he must either make final arrangements with Fuld or get another attorney for trial, then more than a month away. Lustig did not act on this advice until immediately before trial.

At that time, attorney Weidner became counsel of record. He asked for a continuance four days prior to trial. The court denied this motion. Lustig now claims that this failure to grant a continuance resulted in a deprivation of his right to the effective assistance of counsel of his choice. *See, e. g., Powell v. Alabama,* 287 U.S. 45, 67, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Sanders v. Russell,* 401 F.2d 241, 247 (5 Cir. 1968).

Lustig had over a month to obtain a different attorney. He is a man of considerable means.[5] It is very unlikely that he would be unable to find willing counsel in the entire city of Anchorage (which has over 600 attorneys). More probably, he simply did not try very hard. *See Glenn v. United States,* 303 F.2d 536, 543 (5 Cir. 1962) (failure to obtain counsel was defendant's fault).

Lustig relies primarily on *United States v. Mardian,* 178 U.S.App.D.C. 207, 546 F.2d 973 (1977). In that case, the appellant had made a motion for severance two weeks into trial after his attorney unexpectedly became ill and was hospitalized. The circuit court found the denial of this motion to be reversible error, but only because appellant had earlier made a showing to the trial court of substantial prejudice resulting from a joint trial. There was a great disparity in the evidence against the appellant and his three co-defendants. *Id.* at 979–80.

These factors are absent here. The trial had not begun; Lustig had had ample time to obtain alternative counsel. There were no prejudicial factors involved such as the disparity in evidence. As the court in *Mardian* also observed, "[A] defendant's right to an attorney of his choice is not so absolute as to permit disruption of the fair and orderly administration of justice when another competent attorney is available to continue the defense." *Id.* at 979, n. 9. *See also Lofton v. Procunier,* 487 F.2d 434, 435 (9 Cir. 1973).

A trial court has wide discretion to grant or deny continuances. *Ungar v. Sarafite,* 376 U.S. 575, 591, 84 S.Ct. 841, 11 L.Ed.2d 921 (1963). Actual prejudice must be shown before a trial court's denial of a continuance will be reversed. *United States v. Harris,* 501 F.2d 1, 4–5 (9 Cir. 1974); *Daut v. United States,* 405 F.2d 312, 315 (9 Cir. 1968), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1624, 29 L.Ed.2d 114 (1971). Moreover, a court must be wary against the "right of counsel" being used as a ploy to gain time or effect delay. *United States ex rel. Baskerville v. Deegan,* 428 F.2d 714, 716 (2 Cir. 1970).

This court may view the record to determine the adequacy of representation and possible prejudice from a denial of a continuance. *See United States v. Simmons,* 457 F.2d 763, 764 (9 Cir. 1972); *Torres v. United States,* 270 F.2d 252, 255 (9 Cir. 1959). And the record in this case reveals extensive and

---

sentence reinstated. Lustig's appeal in this other case is dealt with in a companion case filed in conjunction with this opinion. *See United States v. Lustig,* 555 F.2d 751 (9 Cir. 1977).

**5.** Lustig claims that the court-imposed freeze over his assets prevented him from hiring counsel. The court's order was for the limited purpose of insuring that Lustig did not flee. It would not have prevented payment of an attorney if a request had been made. Furthermore,

Lustig's present counsel actually terminated his employment with the Anchorage Public Defenders' Office to become Lustig's attorney. One can only infer that some attractive consideration prompted this action. In addition, the attorney immediately rented an office, and hired a secretary, an investigator, a research assistant, and another attorney to work on the case. This hardly suggests either inadequate resources or representation.

competent argument and cross-examination by Lustig's counsel—far more so, we might add, than for his co-defendant. Moreover, this case was relatively uncomplicated, with the government producing its evidence in just six hours.

It is arguable whether the district court should have granted Lustig's new attorney more time.[6] However, the failure to do so falls well short of an abuse of discretion.[7]

## JUROR DISCHARGE

Prior to the start of the second day of trial, Judge von der Heydt met with juror David Gransbury at Gransbury's request. Gransbury revealed that he possessed information about the case which made him believe that appellants were guilty. The judge examined Gransbury under oath, in chambers outside presence of counsel, and finally excused him from further duty. The first alternate was seated in his place in view of the defendants, pursuant to Fed.R.Crim.P. 24(c). Lustig's motion for an evidentiary hearing was denied.

Lustig argues that this excusal violated his right to be present at all critical stages of a proceeding. *See* Fed.R.Crim.P. 43. He cites numerous cases which point to the importance of the court not communicating ex parte with the jury. *See, e. g., United States v. Arrigada,* 451 F.2d 487, 488 (4 Cir. 1971); *Evans v. United States,* 284 F.2d 393 (6 Cir. 1960). Had juror Gransbury been retained, these cases might be applicable.[8]

It is well established that a judge may dismiss a juror for cause without a hearing.

*See, e. g., United States v. Domenach,* 476 F.2d 1229, 1232 (2 Cir.), *cert. denied,* 414 U.S. 480, 94 S.Ct. 95, 38 L.Ed.2d 77 (1973) (dismissal of juror who was 10 minutes late); *United States v. Cameron,* 464 F.2d 333, 335 (7 Cir. 1972) (judge has discretion to remove juror who cannot perform duties). The court is not required to hold hearings on questions of fitness either; *in camera* inquiries are sufficient. *United States v. Crisona,* 416 F.2d 107, 119 (2 Cir. 1969).

This case is similar to *United States v. Houlihan,* 332 F.2d 8 (2 Cir.), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964). There one of the jurors was a practical nurse employed by a heart patient who suffered a heart attack on the eighth day of trial. The juror informed the judge of these facts in his chambers without anyone else present. The judge excused the juror and later informed counsel of his action. Defendant argued on appeal that this violated his Fifth and Sixth Amendment rights. The Second Circuit responded:

"We conclude that defendants' rights were not violated. This circuit has previously held that it was not improper near the end of a trial for a judge to speak privately and off the record to a juror to convince him to remain on the jury after he had requested to be excused for reasons of personal hardship. *United States v. Woodner,* 317 F.2d 649, 652 (2d Cir.), *cert. denied,* 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963). As we said

---

**6.** The record shows that the trial judge mistakenly believed he had no choice in the matter; he thought the Speedy Trial Act, 18 U.S.C. § 3164, rigidly required trial within 46 days after arrest. Ninety days from arrest to trial is allowed. Moreover, delays which are attributable to the defendant are not counted in this period. *United States v. Lemon,* 550 F.2d 467, 470 (9 Cir. 1977).

**7.** Lustig also argues that the court should have granted a continuance to enable him to call the witness who would establish that Newton was motivated by revenge. This request came after the defense rested its case, and thus cannot be said to be a product of anything except lack of due diligence. *See United States v. Harris,* 436 F.2d 775 (9 Cir. 1970). Moreover, the testimo-

ny would have been cumulative and marginally relevant. There was no error here either.

**8.** Appellant also contends that the excusal represented an improper ex parte communication of the court to the jury. But such a communication is necessarily implied by the judge's excusal (it would be difficult to excuse without communicating), and would not be prejudicial in any case because that juror no longer served. Moreover, communications by the judge far more prejudicial and less justified than this one have been found to be harmless error. *See, e. g., United States v. Goodman,* 457 F.2d 68 (9 Cir. 1972) (note from judge).

'we would hesitate to presume that prejudice resulted in the absence of some plain showing to that effect. * * * We have enough confidence in the integrity and fairness of the District Judges to assume that they will not make unfair remarks to jurors while undertaking administrative duties of this nature.' Certainly no greater prejudice can arise when as a result of the interview the juror is dismissed and, in the presence of the defendant and his attorney, an alternate is substituted. The *Woodner* decision is therefore controlling." 332 F.2d at 13 (citations omitted).

*See also United States v. Zambito,* 315 F.2d 266, 269 (9 Cir.), *cert. denied,* 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963) (judge permitted to dismiss juror after disclosure in chambers of untruthful voir dire response).

Courts will not presume prejudice where the judge removes a juror. *United States v. Ellenbogen,* 365 F.2d 982, 989 (2 Cir.), *cert. denied,* 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1966). Most of the cases cited by Lustig in which prejudice was found are ones in which the jury was retained, not excused. It is difficult to see what prejudice could result from placing an alternate juror, approved by the defendants, on the jury in place of a juror who cannot fairly perform his duties. The opposite would have been prejudicial.[9]

## JURY POLL

■ After the verdict was announced, each juror was asked whether a true verdict had been announced. Each juror answered in the affirmative. Nonetheless, Lustig requested that the jury be polled as to each of the four counts, and now asserts that it was reversible error not to use this procedure. We disagree. To follow the procedure he now advocates would be needlessly repetitious.

Lustig would have a valid objection if one or more jury members expressed some uncertainty as to the verdict. *See, e. g., United States v. Edwards,* 469 F.2d 1362 (5 Cir. 1972). There was no uncertainty expressed here. Since jury polling is a matter of discretion for the court, *Shibley v. United States,* 237 F.2d 327, 334 (9 Cir.), *cert. denied,* 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77 (1956), there was no abuse of discretion in this case.

■ Lustig also contends that the jury forms used were incomplete and erroneous. He wanted the court to use a form in which there was a place for each juror to sign after each count of the indictment. But he cites no authority for such a requirement other than one case in which such a form was used. *See Posey v. United States,* 416 F.2d 545, 553 (5 Cir. 1969). In fact, forms do not even have to be used. When they are, any reasonable form will suffice. *See* 23A C.J.S. Criminal Law §§ 1393–95.

■ After the verdict was received, Lustig's counsel filed an affidavit alleging that a juror had repudiated the verdict. This affidavit purported to contain a statement of a juror given to a friend and then overheard by the affiant. The party who allegedly heard this statement is not revealed. The record does not reveal any uncertainty about or disagreement with the verdict by any juror.

Where no dissent or uncertainty is demonstrated in court, testimony will not be received from jurors or others regarding the verdict itself. *Stein v. New York,* 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1952); *Hyde v. United States,* 225 U.S. 347, 382–84, 32 S.Ct. 792, 56 L.Ed. 1114 (1911); *United States v. Stacey,* 475 F.2d 1119, 1121 (9 Cir. 1973). Lustig has shown no reason to vary from this general rule. Therefore, the argument is foreclosed.

---

**9.** Lustig also contends that the excusal of a venireman who failed to take the oath prior to voir dire was prejudicial error. He bases this complaint on some vague religious grounds. This objection is frivolous. There is no indication that the venireman's failure to take the oath had anything to do with religious grounds. And even if it did, the excusal would not violate defendant's rights. *See Grech v. Wainwright,* 492 F.2d 747, 749 (5 Cir. 1974); *United States v. Dangler,* 422 F.2d 344, 345 (5 Cir. 1970).

## SEARCH AND SEIZURE

██ After Lustig was arrested, his vehicle was searched to make an inventory of its contents prior to impounding. This was done according to standard police procedure. *See* 13 A.A.C. § 02.375. During this inventory, the sealing machine and bags were found. These items were properly seized and used as evidence. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (inventory searches and seizures valid). Probable cause was not required.

██ Lustig argues that the search warrant for his house was invalid because it did not contain sufficient information to be a "night time warrant". However, the search occurred at 9:00 P.M., an hour before the "night time" requirement begins. *See United States v. Woodring*, 444 F.2d 749, 751 (9 Cir. 1971). Moreover, the government did not introduce any fruits of that search during its case in chief.[10]

## TESTIMONY OF COMMON LAW WIFE

██ Lustig argues that the testimony of Callie Newton, his common law wife of seven years, was received in violation of the privilege for marital communications.[11] This claim is governed by Rule 501 of the Federal Rules of Evidence, which provides in relevant part:

> "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."

*See also* Fed.R.Crim.P. 26, *as amended* (1972). We therefore turn to federal common law to decide Lustig's claim.

Federal courts recognize two distinct privileges arising out of the marital relationship. The first bars one spouse from testifying against the other. This privilege permits either spouse, upon objection, to exclude adverse testimony by the other. It is what remains of the old common law rule that a spouse was incompetent as a witness for or against the other spouse based on the legal fiction that husband and wife were one person. *See Hawkins v. United States*, 358 U.S. 74, 75–76, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); *Bisno v. United States*, 299 F.2d 711, 721 (9 Cir.), *cert. denied*, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962). This is often referred to as the "anti-marital facts" privilege. *See, e. g., United States v. Smith*, 533 F.2d 1077, 1079 (8 Cir. 1976). *See generally* C. Wright, 2 Federal Practice and Procedure § 405, at 83–86 (1969).

The other privilege protects confidential marital communications. It bars testimony concerning intra-spousal, confidential expressions arising from the marital relationship. *See Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 95 L.Ed. 306 (1951); *United States v. Harper*, 450 F.2d 1032, 1045 (5 Cir. 1971). Unlike the "anti-marital facts" privilege, this privilege survives the termination of the marriage. *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Lewis*, 140 U.S.App.D.C. 40, 433 F.2d 1146, 1150 (1970).

Neither privilege prevents the introduction of Newton's testimony. Both privileges depend on the existence of a valid marriage, as determined by state law. *United States v. Apodaca*, 522 F.2d 568, 571 (10 Cir. 1975); *United States v. Neeley*, 475 F.2d

---

**10.** Lustig also claims that the use of his telephone records as evidence violated his right to privacy. It is well established that the "expectation of privacy" only extends to the content of telephone conversations, not to records that conversations took place. *United States v. Baxter*, 492 F.2d 150, 167 (9 Cir. 1973). *See also United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (subpoena to

bank custodian for checking accounts does not violate rights of defendant).

**11.** We assume the existence of a marriage in accordance with common law principles. Lustig and Newton lived together for many years, had two children, and held themselves out to be husband and wife.

1136, 1137 (4 Cir. 1973); J. Wigmore, Evidence § 2230 (McNaughton ed. 1961). Common law marriage is not valid under Alaska law. A.S. 25.05.011, 261, 311. Therefore, neither privilege applies in this case. *See, e. g., United States v. Boatwright,* 446 F.2d 913, 915 (5 Cir. 1971); *United States v. McElrath,* 377 F.2d 508, 510 (6 Cir. 1967).

Lustig argues, however, that the concept of equal protection compels this court to go beyond existing law and recognize that those married under the common law also are entitled to the marital privileges in federal court.[12] Even if we were to agree with this proposition, however, it would not aid Lustig's cause. The "anti-marital facts" privilege does not survive the termination of the marriage. *United States v. Smith, supra,* 533 F.2d at 1079; *United States v. Fisher,* 518 F.2d 836, 838 (2 Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1972). The record reveals that the Lustig-Newton relationship had been terminated with no chance of reconciliation. The "anti-marital facts" privilege, even if it were held to apply, therefore would not operate.

The confidential marital communications privilege would be equally unhelpful because Newton's testimony concerned matters neither communicative nor confidential in nature. It is well established that the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other. *Pereira v. United States, supra,* 347 U.S. at 6, 74 S.Ct. 358; *United States v. Smith, supra,* 533 F.2d at 1079. Most of Newton's testimony related her observations of Lustig engaging in drug transactions with third parties. These are not communications. *See, e. g., Wolfle v. United States,* 291 U.S. 7, 16–17, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *United States v. Lewis, supra,* 433 F.2d at 1150–51.

Lustig argues that his acts should nonetheless be considered communicative. The privilege has not been extended this far. *See* C. McCormick, Evidence § 79, at 164 (2d ed. 1972). But even if it were, the "communications" were not confidential. Communications made to or in the presence of third parties are not intended to be confidential and are not privileged. *Pereira v. United States, supra,* 347 U.S. at 6–7, 74 S.Ct. 358; *United States v. Burks,* 152 U.S.App.D.C. 284, 470 F.2d 432, 434 (1972).[13]

Accordingly, neither marital privilege would bar Newton's testimony even if it were applicable to the Lustig-Newton common law marriage. We therefore need not reach Lustig's equal protection argument to decide this issue. There was no error in admitting Newton's testimony.[14]

### CROSS-EXAMINATION

■■■ Lustig argues that the district court erroneously curtailed his cross-examination of the informant Tarnef. He sought to examine Tarnef regarding his possible involvement in several criminal activities. He also wanted to inquire whether Tarnef had charges pending against him. Such inquiries would have been for the sole purpose of attacking Tarnef's credibility.

The extent of impeachment is committed to the discretion of the trial court. Fed.R. Evid. 608(b). The court must determine whether the probative value of the evidence is outweighed by the danger of confusion,

12. Lustig bases his argument on the recognition of marriage as a fundamental right to which the equal protection clause extends. *See, e. g., Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). He contends those married under the common law therefore deserve equal treatment under federal evidentiary standards as those married by statute.

13. Acts do not become privileged communications simply by being done in the presence of a spouse.

14. Lustig also contends that the testimony of Newton violated the court's sequestration order. But Lustig fails to cite any portions of testimony in support of this contention or to explain how the order was violated. Moreover, the district court had discretion to receive this testimony in any event. *See Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 90 (1893); *United States v. Cozzetti,* 441 F.2d 344, 349–50 ( 9 Cir. 1971).

prejudice, or waste of time. Fed.R.Evid. 403. The court's determination will not be reversed without a showing of an abuse of discretion. *United States v. Phillips,* 482 F.2d 1355, 1357 (9 Cir. 1973); *United States v. Haili,* 443 F.2d 1295, 1299 (9 Cir. 1971).

Here Lustig was able to make a broad inquiry into the witness' credibility and possible bias. He asked Tarnef about his agreement with Anchorage police and whether he had received any termination of probation or parole as a result of his testimony. He also asked about Tarnef's prior convictions, the nature of his heroin habit, and whether he had lied in other proceedings. In short, there was ample cross-examination permitted on this collateral matter. *See United States v. Allende,* 486 F.2d 1351, 1354 (9 Cir. 1973), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *United States v. Norman,* 402 F.2d 73, 77 (9 Cir. 1968); *Enciso v. United States,* 370 F.2d 749, 751 (9 Cir. 1967).

█ Lustig also complains about the limitations placed on his cross-examination of officers Lau and Jones, and Callie Newton. Yet the record reveals that the court permitted examination into areas it did not have to. For example, Lau was asked whether he was being paid as a witness; Newton was asked why she had sued Lustig and whether she was involved in drug dealing. The record shows that Lustig's counsel often strayed from relevancy in his exhaustive questioning. It was not error for the court to lead him back to it.

### PRETRIAL IDENTIFICATION

█ Lustig argues that the pretrial photographic identification procedures used were impermissibly suggestive in violation of *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The officers were shown four or five photographs without name identification or suggestion as to which one was Lustig. This identification procedure occurred two hours after the cocaine sale. Both officers identified Lustig. Nothing in the procedure itself discloses the suggestiveness disapproved by *Simmons.*

Lustig suggests that the 30 seconds to one minute which Detective Lau had to view the suspect was inadequate for later identification. But periods shorter than this have been deemed adequate. *See, e. g., United States v. Kimbrough,* 528 F.2d 1242, 1243–47 (7 Cir. 1976) (30 seconds); *United States ex rel. Pella v. Reid,* 527 F.2d 380, 385 (2 Cir. 1975) (10–15 seconds). Detective Lau obviously was a good witness in terms of his likely ability to observe and remember the scene. His identification was verified by that of three other persons who saw Lustig for longer periods. There also was substantial corroborative evidence supporting the conviction. *See United States v. Schoore,* 449 F.2d 348, 349 (9 Cir.), *cert. denied,* 405 U.S. 1018, 92 S.Ct. 1299, 31 L.Ed.2d 481 (1971); *United States v. Stinson,* 422 F.2d 356, 357 (9 Cir. 1969).

### STATEMENT BY LUSTIG

█ Lustig objects to the introduction into evidence of the statement "you are not going to pin that on me" made after police discovered a bag of cocaine in the police car near Lustig after his arrest. (This statement was admitted to show that Lustig knew that the bag contained cocaine.) The evidence shows that Lustig was advised of his rights immediately upon arrest. Lustig's statement was made several minutes after this time. Therefore, this evidence was admissible.[15]

### CROSS–EXAMINATION OF PEDERSON

█ Pederson took the stand to advance his defense of entrapment. He now claims that he was denied his right against self-incrimination because he was compelled to tell from whom he had obtained the drugs. Since he failed to identify Lustig as his source, and yet Lustig was convicted, the argument goes, Pederson lost his credibility with the jury and thereby was incriminated.

---

**15.** So too were various statements made by Lustig at the time of booking.

Prior to the government's cross-examination, counsel for Lustig asked Pederson about any meetings or dealings between co-defendants. This line of inquiry was therefore opened before the government began its examination. The government was simply pursuing it. A defendant has no right to give testimony without laying himself open to cross-examination upon that testimony. *Brown v. United States,* 356 U.S. 148, 155, 78 S.Ct. 622, 2 L.Ed.2d 589 (1957).

Since Pederson raised the defense of entrapment, the prosecution was permitted to conduct a "searching inquiry" into the possible predisposition of the defendant. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 1046 (1973). This inquiry necessarily includes the defendant's knowledge of and connections with his co-defendant, since evidence of conspiratorial activity would refute a theory of entrapment. The government's cross-examination was proper.

## COCAINE

■ Lustig raises several familiar arguments regarding the controlled substance cocaine. He first argues that the failure to republish the schedules listing cocaine as a controlled substance is fatal to the indictment. This contention is disposed of by *United States v. Eddy,* 549 F.2d 108 (9 Cir. 1976) (no need for annual republication under statute).

■ Lustig next argues that the trial court erred by not hearing evidence about the pharmacological nature of cocaine. *See United States v. Foss,* 501 F.2d 572 (1 Cir. 1974). The record shows, however, that Lustig presented detailed motions to the court discussing the nature of cocaine. It would have been a waste of time for the court to hear extensive testimony on this marginal issue.

■ Lustig finally argues that cocaine is improperly classified as a controlled substance, since it is relatively harmless. Beyond the fact that the evidence is sharply divided about cocaine, this court has recently rejected a similar contention regarding marijuana—a substance far less dangerous and controversial than cocaine. *See United States v. Rogers,* 549 F.2d 107 (9 Cir. 1976).

## PROSECUTION IN FEDERAL COURT

■ Lustig claims that prosecutors improperly "forum-shopped" for the best court in which to obtain a conviction against him. Of course, cooperation between state and federal officers often occurs, with prosecution through one court system or the other. When in federal court, federal law and procedures apply. Therefore, Alaska law is not relevant. *Elkins v. United States,* 364 U.S. 206, 224, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1959). A federal warrant was obtained for Lustig's arrest, who never was indicted by the state. Moreover, numerous cases have involved similar procedural histories as this one and have been affirmed on appeal. *See, e. g., United States v. Harrington,* 504 F.2d 130 (7 Cir. 1974); *United States v. Sellers,* 483 F.2d 37 (5 Cir.), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1973).

## JURY INSTRUCTIONS

■ Lustig complains about several jury instructions. First he argues that the conspiracy instruction informing the jury that "very little evidence is necessary to show that a particular defendant was part" of the conspiracy was erroneous. However, it is well established that once the existence of a conspiracy is established, only *slight* evidence is required to connect any defendant with it. *United States v. Freie,* 545 F.2d 1217, 1221 (9 Cir. 1976); *United States v. Westover,* 511 F.2d 1154, 1157 (9 Cir. 1975). Thus, the contested instruction correctly states the law.

■ Lustig also requested an alibi instruction and claims that the failure to give it was error. None of the evidence shows any "alibi" and thus the court did not have to give what would have been a misleading instruction in this case. *See United States v. Dye,* 508 F.2d 1226, 1231 (6 Cir. 1974); *United States v. Cole,* 453 F.2d 902, 906 (8

Cir. 1972). However, even if Lustig had presented evidence of an alibi, it would not have rebutted the government's evidence. Presence need not be shown to prove conspiracy. *United States v. Lee,* 483 F.2d 968, 970 (5 Cir. 1973). Here the evidence of extensive telephone calls between Pederson and Lustig would have been sufficient.

 Lustig's other complaints about the jury instructions are frivolous. They also have to be considered against the fact that Lustig's own requested instructions were untimely. Rule 15 of the Rules of the United States District Court for the District of Alaska provides for submission of proposed instructions five days prior to trial. Lustig's instructions were filed the very day that instructions were given. Even if the court had erred, which it did not, the error would have been excusable in light of this tardiness. *See United States v. Tourine,* 428 F.2d 865, 869 (2 Cir.), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1970).

### COMMENTS OF PROSECUTOR AND JUDGE

Lustig complains about a comment of the prosecuting attorney, after the verdict, in which he said that the evidence indicated Lustig perjured himself when he testified in his own defense. The trial judge may or may not have considered Lustig's testimony in sentencing. It does not matter. A judge may consider the candor of the defendant on the stand in passing sentence. *United States v. Cluchette,* 465 F.2d 749, 754 (9 Cir. 1972). As we have so often held, this court will not review a sentence absent some extraordinary circumstance. *United States v. Buck,* 548 F.2d 871, 877 (9 Cir. 1977). No such circumstance exists here.

Lustig also suggests that the trial judge improperly commented that he found counsel's questions to be "marginally relevant." But the jury had already retired from the courtroom when this statement was made. No prejudice was possible. In any event, the trial judge is vested with power to comment fairly to the jury. *Duke*

*v. United States,* 255 F.2d 721, 728 (9 Cir. 1958).

### SUFFICIENCY OF THE EVIDENCE

Lustig argues that the district court erred in not granting a directed verdict on the conspiracy charge because of a lack of evidence. The record shows that the evidence against Lustig was considerable, and far in excess of what has been found by this court to be sufficient. *See, e. g., United States v. Robinson,* 546 F.2d 309, 314 (9 Cir. 1976); *United States v. Freie, supra,* 545 F.2d at 1222.

### CONCLUSION

The judgments of the district court are AFFIRMED.