UNITED STATES of America, Appellee,

v.

**Velma Lee SHUEY, Appellant.**

No. 76–1269.

United States Court of Appeals, Ninth Circuit.

Aug. 31, 1976.

Rehearing Denied Sept. 28, 1976.

Michael J. Rogers (argued), Cleburne, Tex., of Luke & O'Connor, Honolulu, Hawaii, for appellant.

William J. Eggers, III, Asst. U. S. Atty. (argued), Honolulu, Hawaii, for appellee.

## OPINION

Before BARNES, WRIGHT and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was convicted in a jury trial on an indictment charging her with: (1) interstate travel or use of any facility of interstate commerce with intent to conduct an unlawful activity in violation of 18 U.S.C. § 1952 [four counts]; (2) knowingly causing a woman to move in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2422 [three counts].

## EVIDENCE

Viewing the evidence in the light most favorable to the government, there is no doubt but that appellant, during the period in question, was engaged in the operation of massage parlors in Texas and Hawaii and that she caused women to be transported from Texas to Hawaii for employment as prostitutes.

## ISSUES

I. Was it reversible error for the district court to deny appellant's motion for a continuance and to deny her attorney's motion to withdraw?

II. Was representation of appellant by her counsel so inadequate as to amount to a denial of a fair trial?

III. Was alleged "fruit of the poisonous tree" evidence used in a manner which violated appellant's rights?

I.

On May 5, 1975, the day before the trial, appellant's attorney sought to withdraw and appellant requested a continuance. By that time, the government had subpoenaed and obtained the presence, in Hawaii, of six witnesses who resided in the Dallas-Fort Worth area of Texas; the clerk had summoned the veniremen necessary for trial the following day; and the government had expended a substantial amount of time and money interviewing a dozen witnesses and reviewing more than twenty exhibits for trial. Appellant's given reason for wanting to change lawyers was that only two days earlier she had learned for the first time that her attorney was suffering from heart disease. She was afraid, she said, that he would not present a vigorous defense and might collapse during the course of the trial. She claims she knew nothing of his heart trouble until May 3rd, although her attorney had been retained for many months.

Appellant further represented that the new lawyer she wished to hire would not be immediately available, or for some time after the scheduled date of her trial. At the hearing on the motions, the attorney, although conceding a heart problem, told the court that he was physically capable of carrying on with the trial. As an outgrowth of the hearing, the court granted appellant permission to retain new counsel, but required her new lawyer to be present and to render all possible assistance during the course of the trial. The court denied the motions. Original counsel represented appellant at the trial.

During the course of the hearing, the appellant represented to the court that she was fully satisfied with counsel's representation to the time she was informed of his heart condition. In denying the motions, the district judge exercised his discretion and after expounding on the "very heavy calendar" of the court, concluded that the facts presented did not justify a continuance and addressed the appellant thus:

". . . I'm saying to you that if between now and tomorrow you want to secure some other counsel to represent you, that's fine. That counsel will be allowed to represent you. Mr. Dwight, however, will be here in court to be able to supply to the counsel, just as if he were associate counsel, all of the facts and all of the assistance which his own study of your case indicates should be given to you, so that you will in effect have two attorneys." [R.T., Vol. III, pp. 13–14].

The totality of circumstances under which the motions were presented quite clearly pinpoint their untimeliness and support the government's position that there was no compelling necessity for the substitution of counsel. For that matter, the record presents more than a veiled suggestion of a subtle dilatory move on the part of the defense to obtain a delay in the prosecution. In any event, we are convinced that the district court did not abuse its discretion in denying the motions and properly relied on our decision in *Lofton v. Procunier*, 487 F.2d 434 (CA9 1973). We there reiterated the rule that the right to choose one's own attorney is not unlimited and that if the attempted exercise of a choice is deemed dilatory or otherwise subversive of orderly criminal process, the trial court may compel a defendant to proceed with designated counsel. Here, the only reason given by appellant for the proposed substitution is her recently discovered anxiety about counsel's physical ability to last the entire trial. There is no claim that her attorney's heart condition had worsened during the period of his employment from mid-September, 1974, to May 3, 1975. Her attorney had no fear about his ability to proceed, and his performance during the course of the trial demonstrates that appellant's anxiety was groundless.

To nullify the considered judgment of the district judge on a discretionary matter such as this would be nothing short of suggesting an unwholesome delaying tactic to those accused of serious crimes. The battle cry of defendants would become "Fire the attorney, continue the case." Unwarranted

848

continuances under circumstances such as these are among the factors causing the incredible waste of judicial time in the administration of criminal justice.

In full support of the view expressed in *Lofton* is *Nunn v. Wilson*, 371 F.2d 113 (CA9 1967). Cases such as *Lee v. United States*, 98 U.S.App.D.C. 272, 235 F.2d 219 (1956), and *McKenna v. Ellis*, 263 F.2d 35 (CA5 1958), are readily distinguishable and do not support appellant's argument.

## II.

On this issue appellant claims that her trial counsel was incompetent for the following reasons: (a) he did not raise the defense of duress when he knew she was then acting in great fear of her codefendant, and (b) he failed to ascertain the facts relating to the use by the FBI of information obtained from Texas state law enforcement officers.

### (a)

During the course of the hearing on the motion for judgment of acquittal or for a new trial, the appellant offered to prove that if her trial attorney were called as a witness, he would testify that a couple of days prior to the time of the trial a meeting was held between himself and counsel for codefendant Sakamoto, as well as Sakamoto himself. Her attorney would say that at that time it was suggested by the appellant Shuey that the defense of duress should be used by appellant during the course of the trial, and that at that time Sakamoto vigorously objected to such a defense and stated to appellant's attorney, "You know what kind of man I am," and that appellant's attorney told appellant that he ". . . did not want his ass shot," and that if appellant was called as a witness she would testify that she again discussed with her attorney the possibility of using duress as a defense, and that he again advised her against such a move. In fact, she says she took the witness stand really out of fear and did not testify to any of these matters

concerning the threats or intimidations because she was in fear of her own well being and safety. She claims she was also in fear by reason of a threat received the night before she testified, and that she called the Assistant United States Attorney and suggested that she be asked about duress.

The complete answer to appellant's contention is found in the comments of the trial judge in response to the argument of appellant's substituted counsel, from which we quote:

"You know, if your client had not been valedictorian . . . of her class when she graduated from high school, if she had not been a very successful businesswoman, if she were not the one who had all the money and drove the Lincoln Continental and had all the property and the bank accounts in her own name and operated in Texas and operated out here and bought the Waialae Health and Spa and so forth, and Alex Sakamoto wound up with nothing, maybe there would be more merit to your argument [that appellant acted under duress], . . . but that's not the way it was." [R.T., Vol. VII, p. 291].

We will not disturb these findings of the veteran district judge.

### (b)

Upon the evidence introduced at the hearing, the district court found that after appellant was apprehended in a raid upon a Texas massage parlor, she gave a lengthy confession before receiving *Miranda* warnings. At the time, the Texas authorities were interested only in Sakamoto and it was not until later they learned that the FBI in Hawaii was following up leads on appellant. Upon learning of events in Texas, the FBI contacted the Texas authorities. In this confession, a woman known to the investigators in Hawaii as Penny Lopez was identified by the appellant as Eugenia Perez Maceyra. This woman was found in Texas by FBI Agent Oakley, to whom the material was accessible which had been obtained in the raid on the Texas massage

parlor. The confession was part of this material. Appellant claims that her conviction cannot stand because the FBI would never have located Lopez and identified her as Maceyra if they had not obtained this information from the confession. Oakley testified at the time of the post trial motion that he never saw the appellant's confession and that his lead to Lopez was from information entirely independent of that document. Here again, the findings of the district judge are of great importance. We quote:

"[E]ven if Oakley had gone through that transcript page by page, even if he had taken notes by the zillion, there is nothing in the record before this Court, there was nothing in the record at the trial, there was nothing in the record . . . here, to sustain . . . [the] statement that 'without the use of the evidence illegally obtained that the government had virtually no evidence . . .'"

"The only smidgen of possible taint was whether or *no* Oakley had been able to locate Penny Lopez because of something that was in the statement of Velma Lee Shuey and from no other source."

". . . I give Oakley's story credence that he did develop and get the testimony of Penny Lopez in the manner in which he testified here. I would hold that, even if that weren't true, even if it were error to have utilized the evidence which you urge could only have been secured through the information developed out of the testimony of Velma Shuey, even so, I would hold that the taint . . . was so inconsequential and the error, if any, was so inconsequential . . . because the other evidence was so overwhelming, . . . that it would not warrant setting aside the trial. . . ." [R.T., Vol. VII, pp. 278–280].

Thus, it clearly appears that even if appellant's trial attorney had asserted facts relating to the confession at a pretrial hearing on a motion to suppress, it is more than probable that the court would have found, as it did on the post trial motion, that Oakley did not read the confession and found Maceyra through independent research.

The exceptional weight to be given the findings of the trial judge on hearings such as this is ably articulated by Justice Black in *United States v. Johnson*, 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946), where he said:

"The trial judge's findings were supported by evidence. He had conducted the original trial and had watched the case against Johnson and the other respondents unfold from day to day. Consequently, the trial judge was exceptionally qualified to pass on the affidavits. The record of both the original trial and the proceedings on the motions for a new trial shows clearly that the trial judge gave the numerous elements of the controversy careful and honest consideration. We think that even a casual perusal of this record should have revealed to the circuit court of appeals that here nothing more was involved than an effort to upset a trial court's finding of fact."

The same authority restated the dogma that it is not the province of the Supreme Court or of the Courts of Appeal to review orders granting or denying motions for new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact. *Id.* at 111, 66 S.Ct. 464. Beyond question, there was substantial evidence to support the judge's findings upon coercion and admissibility. Additionally, he had the opportunity to, and did, observe the demeanor of the witnesses and pass on their credibility. Obviously, appellant lost on both counts. Concluding on these issues, we find nothing in the representation of appellant's trial counsel to indicate that he failed to render reasonably effective assistance by failing to raise valid defenses or that appellant, by reason of counsel's representation was denied fundamental fairness. *United States v. Elksnis*, 528 F.2d 236 (CA9 1975); *United States v. Stern*, 519 F.2d 521, 524 (CA9 1975).

### III.

 Appellant's argument on the "fruit of the poisonous tree" or "silver platter" doctrine is fully answered by the findings of the district court previously quoted, particularly the finding that Agent Oakley was telling the truth when he testified that his lead to the witness Maceyra was supplied by channels entirely independent of appellant's confession.[1]

The court's finding on this issue is controlling and we need not reach the question on whether conceding, *arguendo*, the invalidity of the confession, the evidence should have been excluded. Moreover, we observe that the seizure was pursuant to appellant's consent, and it would seem that the exclusion of the evidence would in no way serve ". . . to deter future unlawful police conduct." *United States v. Janis,* —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046 [1976]; *United States v. Peltier,* 422 U.S. 531, 536–539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

 In any event, the evidence against appellant, excluding the testimony of Maceyra, is so overwhelming that even if the challenged testimony is tainted, the judgment should be affirmed. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### CONCLUSION

The judgment of conviction must be affirmed.

IT IS SO ORDERED.

---

1. "THE COURT: . . .

"Whenever after a case is tried and a person has taken the stand and has lied on the stand as she did, and as she subsequently in the trial over in the Circuit Court admitted that she lied on the stand, then you come up now with the plea that counsel was incompetent because he put her on the stand because he didn't ask her about how she was under duress, would force a court, not alone in this case but in every case, to try to go back into all of the trial tactics, all that went into the evaluation by an attorney of what evidence should be presented to a jury when a defendant is on trial.

"Not a thing that you have said, not a thing that you have said that Velma Lee Shuey would say would, as this Court sees it, indicate that Dwight was in any way incompetent. The Court heard the trial. The Court observed him. The record will show that he was not just a sham counsel. He was in there doing his best and this Court, not upon her statements now, this Court will not second-guess Dwight. This Court will not say that because you would have done it one way that Dwight was incompetent because he didn't do it that way. . . ." [R.T., Vol. VII, pp. 291–292.]