UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry FLYNT, Defendant-Appellant.

No. 84–5041.

United States Court of Appeals,
Ninth Circuit.

Argued Sept. 7, 1984.

Submitted Sept. 17, 1984.

Decided March 28, 1985.

William L. Webber, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Alan L. Isaacman, Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for defendant-appellant.

Before ELY *, FLETCHER and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge.

Appellant Larry Flynt appeals from five judgments of criminal contempt entered by United States District Judge Manuel Real. Because we conclude that the denial of appellant's motion for a continuance and the resort to summary contempt proceedings constituted abuses of the trial court's discretion, we reverse appellant's convictions and vacate his sentences.

---

* Judge Ely participated in the oral argument and the post-argument conference and joined in the decision to reverse on the grounds stated in this Opinion. He died, however, before the Opinion was prepared.

## I. BACKGROUND

### A. *Events Prior to the Hearing*

On December 12, 1983, Flynt appeared before United States Magistrate James W. McMahon for arraignment on an indictment charging him with flag desecration and unlawful wearing of a Purple Heart. Flynt, who is paralyzed and confined to a wheelchair, had worn an American flag as a diaper and pinned the Purple Heart to his shirt when he appeared at the courthouse in connection with an earlier unrelated contempt proceeding. During his arraignment on those charges, Flynt made a series of insulting, abusive, and obscene remarks to Magistrate McMahon.[1] At the close of the

arraignment, the Magistrate randomly assigned the trial on the issues raised in the indictment to United States District Judge Consuelo B. Marshall. On December 15, 1983, Judge Marshall ordered Flynt to undergo psychiatric evaluation at the Medical Center for Federal Prisoners in Springfield, Missouri, in order to determine his competence to stand trial.

On December 20, 1983, Magistrate McMahon issued an Order to Show Cause why Flynt should not be held in criminal contempt for his conduct during the post-indictment arraignment. The Magistrate ordered Flynt to appear before Chief Judge Manuel Real on January 16, 1984.[2] Be-

1. The dialogue in which appellant and the Magistrate engaged was as follows:

THE MAGISTRATE: Mr. Flynt, if you tell me that you do not understand that you have the right to have an attorney represent you, I am going to be obliged, in order to protect your rights, to appoint an attorney to represent you.

THE DEFENDANT: Don't do me any favors, your honor. I mean, you are the madam, and over here (indicating) is another whore and this guy who says he is my attorney is a streetwalker.

THE MAGISTRATE: Mr. Flynt, I expect you to behave yourself here.

THE DEFENDANT: Then you might as well put my ass in jail. Now, I am trying to be nice to you, god damn it. Now, are you going to let me read my arraignment and plea or are you going to put me in jail again? What the fuck is going on here?

\* \* \* \* \* \*

THE MAGISTRATE: All right. I am going to appoint Mr. Isaacman to represent you as your attorney for these proceedings. You may choose to call—

THE DEFENDANT: Then take my ass to jail, cocksucker, because I—

THE MAGISTRATE: All right.

THE DEFENDANT: —refuse to go through this bullshit.

THE MAGISTRATE: All right, would you proceed with the arraignment?

THE DEFENDANT: You dumb, ignorant mother fucker. Now, I am telling you; you are not going to get away with this.

THE MAGISTRATE: Proceed with the arraignment.

THE DEFENDANT: There are [sic] no fucking way you are going to get away with it. You are denying me my counsel of my choice. You are just as dumb as that god damn Burger up there on the Supreme Court, and I am ready to stay in jail until hell freezes over or until I have the attorney of my choice.

You god damn, no good, 14 karat piece of shit, you. Just cause you got on that robe, you don't have any god damn right to abuse the Constitution that you are supposed to be upholding.

2. In this appeal, Flynt contends, *inter alia,* that the assignment of his contempt hearing to Judge Real was not random, and was therefore erroneous. In support of his contention, Flynt points to Rule 8.1 of General Order 224, promulgated by the United States District Court for the Central District of California. General Order 224 provides for the assignment of cases and duties to judges. Rule 8.1 provides that "[a]ssignment of criminal cases to a judge of the court shall be by random selection by the Magistrate at the time of the arraignment drawing a sealed envelope containing the initials of the judge to whom the case is to be assigned." In response to appellant's contention, the government argues that Rule 8.1 is limited by its language to cases for which there exists an arraignment procedure. Since there is no arraignment procedure for contempt hearings, the government argues that Rule 8.1 is inapplicable. Because we conclude that the contempt convictions must be reversed on other grounds, we need not determine whether the direct assignment of appellant's contempt hearing to Judge Real constituted error. We note, nonetheless, that there is considerable merit to the argument that the assignment of the Order to Show Cause Re Contempt was subject to the General Order and should have been made in a manner that avoided the appearance of arbitrariness and unfairness.

General Order 224 provides for random assignment of both civil and criminal cases. The General Order evinces a policy of objectivity and fairness in the distribution of all matters. This policy is illustrated by the procedure for assigning contempt hearings arising out of

cause Flynt was in the custody of the Medical Center for Federal Prisoners on that date, Judge Real continued the hearing to January 30, 1984.

The psychiatric evaluations of Flynt were completed on January 16, 1984. However, he remained in the custody of the Medical Center for Federal Prisoners until January 27, 1984. While still in Springfield, he filed an *ex parte* application to modify Judge Marshall's commitment order to permit his transfer back to California so that he might gain access to his own psychiatrists and confer with his counsel in preparation for his defense to the Order to Show Cause Re Contempt.[3] In his application Flynt also sought additional medical treatment. The application was denied. During this period Flynt also filed two *habeas corpus* petitions. In those petitions he sought improved medical treatment, access to the Medical Center library and opportunities to consult with potential witnesses in preparation for his defense in "pending litigation." It appears from the record that no action was taken on the *habeas* petitions prior to Flynt's return to California.

On January 30, 1984, Flynt appeared before Judge Real. Flynt's counsel informed the court that Flynt's defense would consist of a showing that he lacked the requisite mental capacity to commit contempt. He argued that Flynt's incarceration in the Medical Center for Federal Prisoners had prevented him from submitting to psychiatric examinations by psychiatrists of his own choosing. He then requested a thirty-day continuance in order to allow Flynt to obtain expert witnesses and to secure substitute counsel.

Judge Real denied the motion for a continuance, concluding that there was no basis for the request. However, he granted a one-day continuance to allow Flynt to obtain his desired counsel.

The next day Flynt again appeared before Judge Real and, through his attorney, renewed his motion for a thirty-day continuance. Flynt's counsel reiterated Flynt's need to obtain psychiatric evaluations relevant to his defense. In support of the motion, he informed Judge Real that he had contacted a psychiatrist, a psychologist and a psychopharmacologist, all of whom had agreed to evaluate Flynt. However, he stated that none of the three prospective witnesses could perform a sufficient examination within the one-day limit imposed by Judge Real. Judge Real again denied the motion for a continuance and began the hearing immediately.

### B. *The Hearing*

Flynt's defense consisted of testimony from seven non-expert witnesses, including himself and his bodyguard, concerning his mental and emotional conditions on the date of the alleged offense. In the course of Flynt's direct examination, he was asked to state reasons for his outbursts before the Magistrate. He responded with a series of epithets directed toward the judici-

---

grand jury proceedings. Pursuant to Rules 9.1–9.3, such hearings are adjudicated by the Criminal Duty Judge. The Criminal Duty assignment rotates among all the district judges (with the exception of the Chief Judge) in order of seniority, and lasts for a period of three months. Thus, although the assignment of such contempt hearings is not, like civil and criminal cases, random, the policy underlying the General Order is served through rotation of the Criminal Duty Judge's functions in a pre-determined manner. Notwithstanding the General Order's purpose of ensuring objectivity and fairness in the assignment of all proceedings, the government urges, essentially, that the General Order is inapplicable to the type of contempt at issue here. We note that the policy embodied in the General Order is important to the fair adminis-

tration of justice, and see no reason why a matter as important as a criminal contempt proceeding would be assigned in a manner that is not consistent with that Order. If there is any doubt that the General Order applies to the type of proceeding at issue here, we are certain that the district court will want to clarify the Order.

**3.** In his *ex parte* application filed in the flag desecration case, Flynt requested transfer in order to prepare his defenses in "other criminal cases pending ... in the Central District of California ..." The district court records reveal that at the time he filed his *ex parte* application, the only criminal matter pending against him in the Central District of California, aside from the flag desecration charge, was the Order to Show Cause Re Contempt.

ary in general.[4] Judge Real called a recess and ordered Flynt gagged. When the hearing resumed, Judge Real admonished Flynt that any further outbursts would result in summary contempt citations. He then ordered removal of the gag and Flynt resumed his testimony.

At the close of Flynt's testimony, his counsel asked him whether he had any further statements to make on his own behalf. Once again, Flynt responded with epithets. Judge Real summarily imposed a thirty-day contempt sentence. Flynt responded with more epithets, which were met by Judge Real with a second summary contempt sentence of thirty days. Flynt again responded with a round of epithets and Judge Real summarily imposed a third thirty-day contempt sentence, at which point Flynt was removed from the courtroom.[5]

Flynt was subsequently returned to the courtroom where he completed his testimony without any further outbursts. At the close of the hearing, Judge Real found Flynt guilty of contempt in Magistrate McMahon's courtroom and sentenced him to six months. In addition, Judge Real reiterated the three thirty-day sentences ordered pursuant to the summary contempt proceedings. Flynt responded to the sentencing with a final string of obscenities, for which Judge Real summarily sentenced him to an additional six months.[6]

Flynt's sentences totalled fifteen months. After appellant had begun serving his sentences, he petitioned Judge Real for an order releasing him on bond pending appeal. In his petition, Flynt indicated an intention to challenge, *inter alia*, the trial court's denial of a continuance and its use

---

4. Appellant's remarks were a part of the following colloquy:

Q: Mr. Flynt, is there any other reason you could give us that you already haven't as to why you said the things you did to Magistrate McMahon on December 12 at the hearing?
A: Yes, there is, Mr. Kahn.
Q: What is it?
A: I went to the United States Supreme Court and I called every one of them no-good, lousy, dumb, mother-fuckers, what assholes they were. And that I would be back as soon as I was allowed out of prison to tell them mother-fuckers they had violated my goddamn mother-fucking civil rights as long as they intend to, and if I am not kept in prison—
MR. KAHN: Your Honor—
[THE DEFENDANT]:—until hell freezes over, I will kill—
MR. KAHN: Your Honor, can we please—
THE DEFENDANT:—every mother-fucking one of them. Blow those mother-fucking judges—
MR. KAHN: Could we have a short recess, please, your Honor—
THE DEFENDANT:—and I don't want—
THE COURT: No, Mr. Kahn, he knows what he is doing.
THE DEFENDANT: No—I don't—
MR. KAHN: Your Honor—
THE DEFENDANT:—and I am crazier than hell. I want a competency hearing.

5. The exchange between appellant and the court was as follows:
FLYNT: I move that you call the U.S. marshal to the stand that was present when I took the drugs, when I was flung on the floor by an inmate, and when I was kicked when I was smacked. I want the U.S. marshal called, I also

want the guard called that tipped me off that this asshole was sending me to Springfield.
THE MARSHALL: Open up the door.
THE COURT: No, that is all right. He's got the responsibility.
That is going to cost you 30 days, Mr. Flynt.
THE DEFENDANT: Hey, you know what punishment—is. Well, you don't give a fuck.
THE COURT: Mr. Flynt, you just keep that up.
THE DEFENDANT: Fuck you. Give me life without parole you foul mother-fucker.
THE COURT: That is another 30.
THE DEFENDANT: I want you—give me more. You chicken-shit son-of-a-bitch.
THE COURT: That is another 30 days.
THE DEFENDANT: Give me more.

6. Appellant's final outburst occurred as follows:
THE COURT: For the contempt of December 12th, 1983, the defendant shall be committed to the custody of the Attorney General or his representative for a period of six months, and for each of the contempts upon which he was cited here in court today, 30 days. Each of those sentences are to run consecutively to each other and not concurrently.
THE DEFENDANT: Give me more, mother-fucker. Is that all you can give me, you chicken-shit cocksucker? Lay 18 months on me, you dumb mother-fucker.
THE COURT: Now—
THE DEFENDANT: Fuck you in your ass.
THE COURT: That is enough.
THE DEFENDANT: You suck—
THE COURT: That will be another six months which will be also consecutive.
THE DEFENDANT: I want you to give me more. Give me more.

of summary contempt proceedings. Judge Real denied the petition, concluding that release on bail would present a risk of flight and that the issues Flynt proposed to raise in his appeal were "frivolous." Because, for reasons we need not detail here, it was perfectly clear that appellant's release would not present an unreasonable risk of flight, and because even a cursory review of the law relating to the proper use of summary contempt proceedings showed that Flynt had raised substantial questions concerning Judge Real's exercise of the summary contempt power, another panel of this court ordered appellant released on bond pending this appeal. At the time he was released, Flynt had already served five months and five days of his sentence.

## C. *Issues on Appeal*

In this appeal Flynt challenges the district court's denial of his request for a continuance and its subsequent invocation of its summary contempt power. In addition, Flynt contends that he was denied his Sixth Amendment right to a jury trial, that he was entitled to a hearing on his mental competence to stand trial, and that his fifteen-month sentence is excessive.

There can be no question that the type of conduct in which Flynt engaged cannot be tolerated in a courtroom. There are a number of measures that may be taken to bring such conduct to an immediate end. Punishment, including a term of incarceration, may be imposed, if appropriate procedures are followed. However, the issue before us is not whether Flynt engaged in the conduct with which he is charged. The issue is not even whether Flynt actually had the mental capacity to commit the offense of contempt. Rather the issues presented here are procedural ones that raise questions of essential fairness. No matter how opprobrious the offense, every person is entitled to have his guilt or innocence determined in a manner that complies with our rules, laws and Constitution.

We conclude that in two essential respects Flynt's convictions were obtained without affording him important procedur-al rights. Both involve the district court's failure to allow Flynt to prove that he did not have the mental capacity to commit contempt. First, Flynt's only defense to the charge of contempt that arose out of the magistrate's proceeding was that he lacked the requisite mental capacity. The district court's denial of a continuance of its hearing effectively foreclosed Flynt from presenting that defense. We must therefore reverse the conviction that was based upon Flynt's conduct before the magistrate. Second, the evidence raised a substantial question as to Flynt's mental capacity to commit the contempts that were based on his conduct before the district court. Accordingly, the district judge erred in punishing Flynt for that conduct without affording him a hearing at which he could present evidence on the issue of his mental capacity. For that reason, we must reverse Flynt's four summary convictions for the conduct that occurred before the district judge. Because we reverse appellant's convictions on these two grounds, we do not address his additional arguments.

## II. THE DISTRICT COURT'S DENIAL OF APPELLANT'S MOTION FOR A CONTINUANCE

### A. *Standard of Review*

 The decision to grant or deny a requested continuance lies within the broad discretion of the district court, and will not be disturbed on appeal absent clear abuse of that discretion. *United States v. Daly*, 716 F.2d 1499, 1511 (9th Cir.1983), *cert. dismissed*, —— U.S. ——, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *United States v. Hernandez*, 608 F.2d 741, 746 (9th Cir.1979); *United States v. Harris*, 501 F.2d 1, 4–5 (9th Cir.1974). We do not find a clear abuse of discretion unless, after carefully evaluating all the relevant factors, we conclude that the denial was arbitrary or unreasonable.

### B. *Considerations Relevant to Our Review*

 We structure our review in accordance with four salient factors that appel-

late courts have considered when reviewing denials of requests for continuances. First, we consider the extent of appellant's diligence in his efforts to ready his defense prior to the date set for hearing. *See, e.g., United States v. Lustig,* 555 F.2d 737, 744 (9th Cir.), *cert. denied,* 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); *United States v. Brandenfels,* 522 F.2d 1259, 1263 (9th Cir.), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975). Second, we consider how likely it is that the need for a continuance could have been met if the continuance had been granted. *See, e.g., United States v. Hernandez,* 608 F.2d at 746 (9th Cir.1979). Third, we consider the extent to which granting the continuance would have inconvenienced the court and the opposing party, including its witnesses. *See, e.g., United States v. Shuey,* 541 F.2d 845, 847 (9th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977); *United States v. Charnay,* 577 F.2d 81, 84 (9th Cir.1978); *United States v. Cueto,* 611 F.2d 1056, 1060 (5th Cir.1980). Finally, we consider the extent to which the appellant might have suffered harm as a result of the district court's denial. *See, e.g., United States v. Long,* 706 F.2d 1044, 1053 (9th Cir.1983); *United States v. Barrett,* 703 F.2d 1076, 1081 (9th Cir.1983); *Powell v. United States,* 420 F.2d 799, 801 (9th Cir. 1969); *Lustig,* 555 F.2d at 745, n. 7.[7]

We acknowledge that the determination of whether a denial of a continuance constitutes an abuse of discretion turns largely upon the circumstances of the individual case. *See Ungar v. Sarafite,* 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). In determining whether the district court has acted in an arbitrary or unreasonable manner, we consider the relevant fac-

tors together, evaluating the extent of the appellant's showing on each one. The weight which we attribute to any single factor may vary with the extent of the showings on the other factors. However, in order to obtain a reversal, appellant must show at a minimum that he has suffered prejudice as a result of the denial of his request. *United States v. Maybusher,* 735 F.2d 366, 369 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985); *United States v. Lustig,* 555 F.2d at 744.

### 1. Diligence

In defense to the charge of contempt before the magistrate, appellant proposed to offer evidence that he lacked the requisite capacity to commit contempt. To this end, appellant was entitled to call psychiatric witnesses of his own choosing who, after examining appellant, could testify as to his mental state. However, appellant remained incarcerated in the Medical Center in Springfield, Missouri until three days prior to the hearing and was not examined by any such prospective witnesses. While at the Medical Center, appellant filed an *ex parte* application for transfer back to California in which he specifically stated his need to return so that he might gain access to his own psychiatrists in preparation for his defense to the contempt charge. In addition, one of the two *habeas* petitions filed by appellant while at the Medical Center referred to his need to consult with potential witnesses in preparation for his defense in "pending litigation." None of his requests was granted. Subsequently, upon the district court's grant of a one-day continuance rather than the thirty-day continuance requested by appellant, appellant's counsel advised the court that he had obtained three expert witnesses but that while all three had agreed to examine ap-

---

7. In *United States v. Hoyos,* 573 F.2d 1111, 1114 (9th Cir.1978), we set forth the showing a party ordinarily must make when seeking a continuance to obtain absent witnesses. This showing includes the substance of the desired testimony; that the testimony would be relevant; that it could be obtained if the continuance were granted; and that due diligence has been exer-

cised to obtain the testimony prior to the date of the proceeding. *See also United States v. Sterling,* 742 F.2d 521, 525 (9th Cir.1984). Since the elements of the showing specified in *Hoyos* are applicable to various factors which we have identified as relevant to our review, we address these elements as part of our broader inquiry.

pellant and testify to their conclusions, they were unable to perform adequate evaluations within the time constraints imposed by the district court. *Compare United States v. Barrett,* 703 F.2d 1076, 1080 (9th Cir.1983) (defendant was first notified of government's intention to present expert witness eight days before trial and made "diligent effort" to secure rebuttal expert; continuance should have been granted), *with Lustig,* 555 F.2d at 744 (request for continuance in order to obtain alternative counsel was properly denied because defendant had ample time and resources to obtain desired counsel prior to trial).

We recognize that appellant might have exercised greater diligence than he did. We do not intend to suggest that the degree of diligence demonstrated by appellant would necessarily be adequate under other circumstances. However, where, as we later conclude to be the case here, the continuance would have served a useful purpose, granting the request would not have inconvenienced the court, the other party or any witnesses, and appellant has suffered severe prejudice as a result of the denial of his motion, we find the degree of diligence to have been sufficient.

### 2. *Usefulness of the Continuance*

At the time appellant renewed his continuance motion, the prospective witnesses had been identified and their availability for a later hearing had been ensured. Since the court had not allowed adequate time for these persons to perform examinations, however, Flynt obviously could not present to the court the substance of their testimony. Nevertheless, it should have been apparent from the nature of Flynt's defense, from his erratic behavior, and from the other evidence before the district court[8] that the testimony would be relevant. To require any greater specificity under these circumstances would not have

been reasonable. In our view, the continuance, if granted, clearly would have served a useful purpose. *See United States v. Barrett,* 703 F.2d 1076, 1081 (9th Cir.1983) (defendant "probably could have obtained an expert to assist him if he had been given more time.... In failing to grant the requested continuance ... the trial court clearly abused its discretion." (citation omitted)); *cf. United States v. Hoyos,* 573 F.2d 1111, 1114 (9th Cir.1978) (denial of continuance proper where, *inter alia,* moving party could not demonstrate that he could produce prospective witness even if continuance was granted); *Powell v. United States,* 420 F.2d at 801 (denial of continuance proper when, *inter alia,* moving party could not show that prospective witnesses could be located within a reasonable time); *United States v. Hernandez,* 608 F.2d at 746 (denial of continuance proper when moving party could not demonstrate that desired testimony could be obtained even if continuance was granted).

### 3. *Inconvenience*

The record demonstrates that granting appellant's request would not have resulted in any cognizable inconvenience to the court or the government. The hearing began at 1:30 p.m. and ended later that same day; recalendaring the proceedings would not have created any scheduling difficulties for the court. The government had no witnesses to call. It relied exclusively on the transcript of the proceeding before the magistrate. *See United States v. Shuey,* 541 F.2d 845, 847 (9th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977) (government had spent substantial time and money interviewing witnesses and reviewing exhibits and had subpoenaed witnesses from Texas to Hawaii; motion for continuance made on eve of trial properly denied); *cf. United States v. Brandenfels,* 522 F.2d at 1263 (motion

---

**8.** This evidence included a psychiatric evaluation of appellant, prepared during his stay at the Medical Center, in which he was diagnosed as suffering from a personality disorder which was characterized by irrational angry outbursts and an intense need for control and attention. Al-

though this evaluation was not dispositive of the issue concerning Flynt's capacity to commit contempt, *see infra,* note 11, it certainly indicated that a legitimate issue existed as to Flynt's mental state.

for continuance made late in the proceedings; denial of continuance proper in view of excessive trial preparation required of the government and the number of witnesses expected to be called). Thus, the third factor militates strongly in appellant's favor.

### 4. *Prejudice*

It is clear that appellant's sole defense to the contempt charge was that he lacked the requisite mental capacity to commit the offense. It is equally clear that he could not establish this defense without the testimony of expert witnesses. Although he had identified his expert witnesses, they had not had an opportunity to examine him and, therefore, were not in a position to testify. Thus, the result of the court's refusal to grant a continuance "was to deprive the accused of the only testimony potentially effective to his defense." *United States v. Fessel*, 531 F.2d 1275, 1280 (5th Cir.1976).

The compelling importance of psychiatric evidence in criminal proceedings is well recognized. Recently, the Supreme Court acknowledged the "pivotal role" of psychiatry in criminal proceedings, when it held that the constitution requires states to provide indigent defendants with access to competent psychiatric assistance to aid in defense preparation. *Ake v. Oklahoma*, —— U.S. ——, —— – ——, 105 S.Ct. 1087, 1094–1097, 84 L.Ed.2d 53 (1985). There, the Court stated, "[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshall his defense." —— U.S. at ——, 105 S.Ct. at 1095.

This same recognition surfaces in several reported cases involving continuances requested to obtain psychiatric evaluation or testimony. In *United States v. Fessel*, for instance, the Fifth Circuit held that the district court abused its discretion by refusing to grant a continuance sought to secure the defendant's psychiatric records and to subpoena psychiatrists who had examined him.

531 F.2d at 1280–81. The court noted the "critical significance" of the evidence to the defendant's insanity defense, and concluded that the defendant had been denied a fair trial. *Id.* at 1281.

The Fourth Circuit reached a similar conclusion in *United States v. Walker*, 537 F.2d 1192 (4th Cir.1976). There, defendant's counsel moved prior to trial for the appointment of a psychiatrist to determine the defendant's competency to stand trial and his mental capacity to commit the offense charged. The court granted the motion, and a psychiatrist concluded, after a thirty-minute interview, that the defendant was competent to stand trial. Defense counsel reviewed the report shortly before trial and around the same time also learned of the defendant's extensive history of psychiatric treatment. On the morning of trial, defense counsel moved for a two-week continuance to investigate the defendant's mental capacity further. The trial court denied the motion and began the trial immediately. The court of appeals reversed and concluded that "Walker's right to a fair trial was violated because his counsel was deprived of an adequate opportunity to determine the existence of a substantial insanity defense." *Id.* at 1194; *see also Hicks v. Wainwright*, 633 F.2d 1146, 1150 (5th Cir.1981) (denial of fair trial to refuse requested six-hour continuance to enable defense psychiatric expert to appear and testify). *But see Hutchins v. Garrison*, 724 F.2d 1425, 1434–35 (4th Cir.1983) (not an abuse of discretion to deny continuance to prepare insanity defense because counsel was appointed three months before trial and defendant failed to show even "the mere possibility of prejudice"), *cert. denied*, —— U.S. ——, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984).

We find these cases persuasive. The importance of expert witnesses to Flynt's defense is obvious. It is underscored by the district court's treatment of the nonexpert witnesses Flynt called. The district court repeatedly thwarted defense counsel's efforts to elicit testimony concerning Flynt's mental capacity from those witness-

es, ruling that they were not qualified to testify on that subject. In short, Flynt was not allowed to put forward the only defense he had. We are convinced, therefore, that Flynt suffered severe prejudice as a result of the district court's refusal to grant a continuance.

### C. *Conclusion*

■ There are no mechanical tests for deciding when a denial of a continuance warrants reversal. *See Ungar v. Sarafite,* 376 U.S. at 589, 84 S.Ct. at 849. However, the absence of a mechanical test does not insulate the district court from a searching review of decisions that have been committed to its discretion. Here, appellant has established that he suffered prejudice as a result of the district court's decision to deny the continuance. After considering that fact and evaluating the extent of the prejudice along with the strength of appellant's showings as to the other factors we have discussed, we have no alternative but to conclude that the denial of a continuance was arbitrary and unreasonable. Hence, we find that the district court abused its discretion in denying the continuance and we reverse the conviction that was based on appellant's conduct before Magistrate McMahon.

### III. THE DISTRICT COURT'S USE OF SUMMARY CONTEMPT POWER

We now turn to the four summary contempt convictions that were based on appellant's conduct during the district court hearing. Our determination that the district court abused its discretion in denying appellant's request for a continuance does not, of course, absolve appellant of criminal

responsibility for any unlawful conduct in which he engaged during that hearing. Although the hearing should not have taken place when it did, its participants were nevertheless required to conform their conduct to the law. Accordingly, our task now is to determine whether the district court appropriately exercised its summary contempt power in response to the conduct that occurred in its presence.

### A. *Standard of Review*

■ We review the district court's exercise of its summary contempt power for abuse of discretion. *See United States v. Wilson,* 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975); *In re Gustafson,* 650 F.2d 1017, 1022 (9th Cir.1981) (en banc).

### B. *The Nature of Summary Contempt Power*

The power to punish contumacious conduct through summary proceedings flows from Fed.R.Crim.P. 42(a), which provides as follows:

A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered on record.

Summary proceedings constitute a narrow exception to the well-established rule set forth in Fed.R.Crim.P. 42(b). Under Rule 42(b), an alleged contemnor is entitled to notice of the charges and a reasonable opportunity to meet them.[9] "Rule 42(b) prescribes the 'procedural regularity' for

---

**9.** Rule 42(b) provides as follows:

(b) **Disposition Upon Notice and Hearing.** A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attor-

ney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

all contempts in the federal regime, except those unusual situations envisioned by Rule 42(a) where instant action is necessary to protect the judicial institution itself." *Harris v. United States,* 382 U.S. 162, 167, 86 S.Ct. 352, 355, 15 L.Ed.2d 240 (1965) (footnote omitted).

 Summary contempt procedure represents a significant departure from the accepted standards of due process. *See In re Oliver,* 333 U.S. 257, 275, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948) ("Except for a narrowly limited category of contempts, due process of law ... requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf...."). Moreover, in a summary contempt proceeding, the otherwise inconsistent functions of prosecutor, jury and judge are united in one individual. *In re Gustafson,* 650 F.2d at 1022. For these reasons, we view the use of summary contempt power as an extraordinary exercise to be undertaken only after careful consideration and with good reason. *Id.* Throughout our review, we remain mindful of the principle that "only 'the least possible power adequate to the end proposed' should be used in contempt cases." *Wilson,* 421 U.S. at 319, 95 S.Ct. at 1808 (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821)).

 Under Rule 42(a), the only absolute prerequisites to summary treatment of contempt are the requirements that the contumacious behavior be seen or heard by the judge and that it be committed in the actual presence of the court. *Gustafson,* 650 F.2d at 1021. When these requirements are satisfied, the trial court is empowered, in its discretion, to invoke summary procedures. *Id.* However, there are limits to the exercise of this discretionary power, and the satisfaction of these prerequisites does n ot permit the invocation of

summary procedures in all cases. The district court's exercise of the summary contempt power must be consistent with the reasons and purposes underlying the existence of Rule 42(a).

The justification for Rule 42(a)'s existence is twofold.[10] First, the need to overcome obstructions to ongoing proceedings warrants a procedure whereby a trial judge may, in a summary fashion, remedy a breakdown in the orderly operation of the judicial system. *See United States v. Wilson,* 421 U.S. at 316, 95 S.Ct. at 1806. Second, since the judge is personally aware of the allegedly contumacious conduct, the need for a hearing is eliminated. *United States v. Marshall,* 451 F.2d 372, 374, 377 (9th Cir.1971) (per curiam). When trial courts have exercised the summary contempt power in a manner that is not consistent with *both* justifications underlying Rule 42(a), appellate courts have found abuses of discretion, even though the power was exercised in response to conduct heard or seen by the judge and committed in the actual presence of the court. *See, e.g., Harris v. United States,* 382 U.S. at 164, 86 S.Ct. at 354 (invocation of summary contempt power in response to grand juror's refusal to testify was error where refusal did not constitute such an open, serious threat to orderly procedure that instant and summary punishment was necessary and when delay necessary for a hearing would not imperil the proceedings); *United States v. Abascal,* 509 F.2d 752, 756 (9th Cir.) (imposing summary contempt for conduct that occurred after court had been recessed and while judge was leaving the bench was improper; Rule 42(b) procedure should have been followed), *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975); *see also Panico v. United States,* 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1 (1963) (per curiam) (discussed *infra,* p. 1364); *Rollerson v. United States,* 343 F.2d 269 (D.C.Cir.1964) (discussed *infra* p. 1364.

Here, it is clear from the record that the absolute prerequisites to the district court's

---

**10.** *See United States v. Meyer,* 462 F.2d 827, 831 (D.C.Cir.1972); Kuhns, *The Summary Contempt Power: A Critique and a New Perspective,* 88 Yale L.J. 39, 42 (1978).

exercise of the summary contempt power were satisfied; the district judge certified that he observed appellant's conduct and that it occurred in the actual presence of the court. The only question, therefore, is whether, under the circumstances of this case, the district court's imposition of summary punishment was consistent with both justifications underlying Rule 42(a).

### C. *The District Court's Invocation of Summary Contempt Proceedings*

The district court exercised its summary contempt power on four occasions: in response to each of three successive outbursts by appellant in the course of his testimony and in response to a similar episode at the close of the hearing. Appellant contends that in view of the facts and circumstances that gave rise to his outbursts, there existed an issue as to his mental capacity to commit contempt. He argues that when such an issue exists, summary contempt proceedings are inherently inappropriate and an evidentiary hearing on the alleged contemnor's capacity to commit contempt is required pursuant to Rule 42(b). In light of the relevant case law and the rationale underlying Rule 42(a), we agree.

Appellant's contention gains initial support from two cases which address the same issue that appellant raises here. In *Panico v. United States*, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1 (1963) (per curiam), the Court vacated a summary contempt conviction that had been entered against Panico for his conduct during trial. Shortly after the contempt conviction, state-appointed psychiatrists found that Panico suffered from schizophrenia, and he was subsequently committed to a state mental hospital. On appeal, Panico argued that at the time of his allegedly contumacious conduct, he was suffering from a mental disorder that rendered him incapable of forming the requisite criminal intent. Although the trial judge had heard conflicting expert testimony on the issue of Panico's mental competency to stand trial, he had not conducted a separate hearing to resolve the issue of Panico's capacity to commit the offense. The Court held:

> In light of these circumstances, we hold that the fair administration of federal criminal justice requires a plenary hearing under Rule 42(b) of the Federal Rules of Criminal Procedure to determine the question of the petitioner's criminal responsibility for his conduct.

*Id.* at 30, 84 S.Ct. at 20 (footnote omitted).

In a similar case, the District of Columbia Circuit also reversed a summary contempt conviction which had been entered despite the existence of a substantial question as to the individual's mental capacity to commit contempt. In *Rollerson v. United States*, 343 F.2d 269 (D.C.Cir.1964), a defendant who was being tried for robbery threw a water pitcher which struck the prosecutor. After the jury returned a guilty verdict, the trial judge entered a summary contempt conviction. In reversing the judgment, the court looked to the evidence that Rollerson had presented in support of his insanity defense to the underlying robbery charge. The court observed that Rollerson had adduced evidence involving incidents which occurred within two months of trial. The court noted further that one of Rollerson's experts had concluded that he was insane based upon a diagnosis which had taken place within four months of the contempt. The court therefore concluded that "there was a *substantial issue* of Rollerson's responsibility for his conduct at trial, and the contempt conviction must be reversed for new proceedings under Rule 42(b)." *Id.* at 277 (footnote omitted) (emphasis added).

The rationale underlying the summary contempt power compels us to adopt the substantial issue test articulated in *Rollerson*. As we have noted, one of the reasons for permitting the summary adjudication of contempt is that a judge who exercises the summary contempt power has full and immediate knowledge of the facts relevant to an adjudication for contempt. *See Sacher v. United States*, 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952) ("We think 'summary' as used in [Rule 42(a)]

refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial. The purpose of that procedure is to inform the court of events not within its own knowledge. The Rule allows summary procedure only as to offenses within the knowledge of the judge because they occurred in his presence."). However, when, at the time of the allegedly contumacious conduct, the district court has before it information that raises a substantial issue as to the criminal responsibility of the alleged contemnor, and when facts necessary to a proper resolution of that issue are beyond the personal knowledge of the judge, then there is no basis for Rule 42(a) proceedings, and summary adjudication is inappropriate.

 The record in this case reveals clearly that at the time of the hearing a substantial issue existed as to appellant's mental capacity to commit contempt. Of primary significance is the 32 page psychiatric evaluation of appellant prepared at the Medical Center for Federal Prisoners 16 days prior to the hearing. In this evaluation, the government psychiatrists expressed their opinion that appellant was competent to stand trial. They concluded, however, that he was suffering from a bipolar affective disorder, manic type, which gave rise to frenetic activity, restlessness, grandiosity, flight of ideas, instability and distractability. The psychiatrists observed that appellant had been suffering from a personality disorder of longstanding duration, characterized by narcissistic, histrionic and antisocial behavior. They concluded that as a result of appellant's personality disorder, he exhibits an intense need for control, an insatiable need for attention and engages in irrational angry outbursts. Consistent with this conclusion, the psychiatrists noted that appellant has frequently been abusive in court and generally showed contempt for judicial authority. They further observed that although appellant had not shown psychotic features, his grandiosity exceeded that normally seen in those with personality disorders and was indicative of more serious problems. Finally, in their report the psychiatrists noted that appellant's mental illness rendered his conduct highly volatile, admonishing that "[i]t might be wise to assess Mr. Flynt's performance during the course of any court proceeding. If his performance significantly deteriorates, a brief recess could be called to further evaluate the situation. Because of Mr. Flynt's mental illness, his performance at any given trial is subject to variability." [11]

11. We note that the contents of the government's report raised a substantial question concerning appellant's capacity to commit contempt notwithstanding its conclusion that appellant was competent to stand trial. The issue of appellant's criminal responsibility for either the underlying charge of contempt or the summary charges involves different considerations from those involved in an inquiry into competence to stand trial. *See Panico v. United States,* 375 U.S. at 30, 84 S.Ct. at 20. To be competent to stand trial, "a criminal defendant must have sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings." *Chavez v. United States,* 656 F.2d 512, 518 (9th Cir.1981). In contrast, the test for capacity to commit an offense inquiries into whether "at the time of the alleged criminal conduct, as a result of mental disease or defect [the defendant] lacked substantial capacity to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct." *United States v. Sims,* 637 F.2d 625, 628 (9th Cir.1980) (quoting *United States v. Monroe,* 552 F.2d 860, 863 (9th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069 (1977)). Thus, a finding that a defendant is competent to stand trial does not, as a matter of law, dispose of the different question concerning his criminal responsibility. *Cf.* 18 U.S.C. § 4244 (1982) ("A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged ...."). Here, the conclusions contained in the Medical Center evaluation are directed toward appellant's competence to stand trial, and should not be read to establish his criminal responsibility for any of the charges of contempt leveled against him. *See United States v. Hearst,* 412 F.Supp. 858, 859 (N.D.Cal.1975) (the test for competency to stand trial must be distinguished from the test or standard to be

In addition to the psychiatric report, appellant's bizarre references to highly unlikely events, along with the extreme nature of his outbursts, raised substantial questions concerning the issue of criminal responsibility.[12] We are well aware of the possibility that appellant's words and conduct might have been deliberately designed to provoke the district court. We are equally aware that appellant may well have been possessed of the requisite mental capacity to commit contempt. Nevertheless, the nature of his words and conduct would raise a substantial question as to mental capacity in the mind of any reasonable observer, a question that could be answered only on the basis of facts beyond the immediate knowledge of a district court.

■ Since a substantial question existed as to appellant's capacity to commit contempt, summary proceedings were inappropriate. Appellant was entitled to present his defense of lack of capacity and to offer evidence on that question. The procedures set forth in Rule 42(b) should have been followed. Accordingly, we reverse the four summary contempt convictions for conduct that occurred during the hearing before the district court.[13]

## IV. REMEDY

Having determined that reversal of all five of the contempt convictions is required, we would ordinarily remand the matter to the district court for further appropriate proceedings. *See, e.g., Harris v. United States,* 382 U.S. at 167, 86 S.Ct. at 355; *Panico v. United States,* 375 U.S. at 31, 84 S.Ct. at 20. Here, however, the facts and circumstances that gave rise to this appeal prompt us to follow an alternative procedure.

■ Since sentences for contempt authorized under 18 U.S.C. § 401 are not subject to a statutory upper limit, they are directly reviewable and may be revised by an appellate court. *United States v. Mil-*

---

used in determining criminal responsibility); *accord United States v. Walker,* 537 F.2d 1192, 1195 (4th Cir.1976); *United States v. Collins,* 491 F.2d 1050, 1053 (5th Cir.), *cert. denied,* 419 U.S. 857, 95 S.Ct. 104, 42 L.Ed.2d 90 (1974); *United States v. Mercado,* 469 F.2d 1149, 1152 (2d Cir. 1972); *United States v. Taylor,* 437 F.2d 371, 375–76 (4th Cir.1971) ("Whether a person charged with a crime is mentally competent to stand trial is a discrete question, governed by different medical and legal standards from the question of criminal responsibility .... That a defendant may have exhibited such an absence of capacity to control his conduct as to indicate the possibility of a defense of insanity does not, of itself, answer the wholly different question of whether his understanding is presently so limited as to require that he not be tried at all. The one question may have little or no bearing upon the other, for many defendants who may not be held criminally responsible for their unlawful acts are clearly competent to stand trial.")

12. Appellant's statements included an intention to run for president; a contention that the FBI and members of the John Birch Society had attempted to assassinate him; a request for video equipment so that he could exhibit videotapes of presidential cabinet members engaged in sexual activity; and a reference to a recent conversation with Marilyn Monroe.

13. We also question whether Judge Real properly imposed summary contempt for Flynt's final outburst. At that point, Flynt's conduct could not have been a disruption of an "ongoing proceeding;" the proceedings virtually had ended. *See Taylor v. Hayes,* 418 U.S. 488, 498, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974); *United States v. Abascal,* 509 F.2d 752, 756 (9th Cir.), *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975). *In Re Gustafson,* 650 F.2d 1017 (9th Cir.1981) (en banc), is not to the contrary. In *Gustafson,* this court upheld the summary contempt conviction of an attorney whose contemptuous conduct occurred during his closing argument at the end of the day's proceedings but prior to the close of the trial. We noted that counsel for five codefendants had yet to give their closing arguments, the prosecution had yet to give its rebuttal, and the judge had yet to instruct the jury. Thus, "Gustafson's contempt, if left unpunished, might have spawned other misconduct." *Id.* at 1023. Here, the possibility of subsequent misconduct posed no threat of obstruction, since there existed no further proceeding to obstruct.

In addition, we question the use of summary contempt here, considering that Flynt's remarks were highly personal, derogatory attacks leveled at Judge Real. Under such circumstances, due process ordinarily requires that the defendant be tried before a judge other than the one reviled by the contemnor. *See Mayberry v. Pennsylvania,* 400 U.S. 455, 466, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971); *see also Taylor v. Hayes,* 418 U.S. at 501, 94 S.Ct. at 2704; *cf.* Fed.R.Crim.P. 42(b).

ler, 588 F.2d 1256, 1265 (9th Cir.), cert. denied, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); see also Green v. United States, 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672 (1958) ("The 'discretion' to punish vested in the District Courts by § 401 is not an unbridled discretion. Appellate courts have here a special responsibility for determining that the power is not abused, to be exercised if necessary by revising themselves the sentences imposed."); United States v. Gracia, 755 F.2d 984, 988–991 (2nd Cir.1985).

█ Upon determining that the objective which a district court seeks to achieve through punishment for contempt may be accomplished through less extreme measures, appellate courts are empowered to vacate that portion of the contemnor's sentence that exceeds "the least possible power adequate to the end proposed," Harris v. United States, 382 U.S. at 165, 86 S.Ct. at 354. See, e.g., United States v. Abascal, 509 F.2d 752, 757 (9th Cir.), cert. denied, 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975) (contemnor's conduct in district court did not warrant exercise of summary contempt power and objective of summary punishment, to secure obeyance of court's order concerning courtroom demeanor, had been achieved by the two weeks of incarceration contemnor had already served; court remanded for vacation of remainder of ninety-day sentence); United States v. Camil, 497 F.2d 225, 229–230 (5th Cir.1974) (where trial judge's failure to prepare certificate of contempt merited reversal of conviction, and where primary purpose of punishment in this case was to preserve order during trial, termination of trial rendered remand futile, and mere reversal was appropriate); United States v. Schrimsher, 493 F.2d 842, 845 (5th Cir.1974) (where insufficient certificate of contempt merited reversal of contempt conviction, where purpose of punishment in this case was to preserve order in the courtroom during trial, and where trial had long since concluded, reversal of conviction and dismissal of proceedings against alleged contemnor was appropriate); United States ex rel. Robson v. Malone, 412 F.2d 848, 850–51 (7th Cir.

1969) (per curiam) (although appellants' failure to rise upon court's instruction was contemptuous, appellants' exclusion from the courtroom and retention in custody for several hours adequately served the purpose of the court's summary punishment and vacation of sentence was appropriate).

█ Here, we conclude that remanding the matter for further proceedings in the district court would be inappropriate. It is apparent that the fifteen-month punishment was intended to "vindicate the authority of the court." United States v. Powers, 629 F.2d 619, 627 (9th Cir.1980). However, we are convinced that even if appellant's convictions had withstood the challenges he has raised on this appeal, no punishment in addition to the five months and five days of incarceration which he has already served would be warranted. To the extent that the authority of the district court can be vindicated by the imposition of punishment in this case, the punishment already inflicted exceeds that which would have resulted had the district court exercised "the least possible power adequate to the end proposed." Wilson, 421 U.S. at 319, 95 S.Ct. at 1808.

For the sake of completeness, we note that there is a serious question whether the punishment, as it was imposed in this case, actually served the district court's purpose. As portions of the colloquy between appellant and the district court strongly suggest, it is just as likely that it served appellant's purpose instead. In any event, it would not be in the best interests of the judicial system or the public to prolong this travesty any further. The time has come to draw the curtain on a seamy and tawdry episode. We do so now by vacating appellant's sentences.

REVERSED AND VACATED.