FILED

JUN 06 2012

NOT FOR PUBLICATION

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.  CC-11-1542-HPaD |
| | ) | |
| TATIANA KHAN, | ) | Bk. No.   11-36527 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TATIANA KHAN, | ) | |
| | ) | |
| Appellant, | ) | **M E M O R A N D U M**[1] |
| | ) | |
| v. | ) | |
| | ) | |
| JASON M. RUND, Chapter 7 | ) | |
| Trustee; UNITED STATES | ) | |
| TRUSTEE, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on May 17, 2012
at Pasadena, California

Filed - June 6, 2012

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Sandra P. Klein, Bankruptcy Judge, Presiding

_____

Appearances:    Joseph Scott Klapach of Klapach & Klapach argued
                for Appellant Tatiana Khan; Brad D. Krasnoff of
                Lewis Brisbois Bisgaard & Smith LLP argued for
                Appellee Jason M. Rund, Chapter 7 Trustee.

_____

Before: HOLLOWELL, PAPPAS, and DUNN, Bankruptcy Judges.

_____

    [1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

The debtor appeals the order of the bankruptcy court converting her chapter 11 bankruptcy case to chapter 7. We AFFIRM.

## I. FACTS

Tatiana Khan (the Debtor) is an interior designer. Her business, Chateau Allegre, specializes in offering clients rare and valuable antiques and artwork. The Debtor houses her collection of antiques and artwork (the Inventory) at her commercial business property in West Hollywood, California (the Property). The Property also serves as the Debtor's residence.

In 2010, the Debtor was indicted for fraud after selling a drawing to Victor Sands (Sands) for $2,000,000. She represented that the drawing was an original Picasso; instead, it had been forged by an art restorer at her direction. As part of a plea agreement, the Debtor stipulated that she "persuaded clients . . . to purchase art, antiques, and decorative objects by making false representations and material omissions of fact about their origins and their values." The Debtor agreed to pay restitution to Sands, including giving him the rights to any property acquired as a result of her illegal activities, namely, a painting by Willem de Kooning that she bought with the proceeds of the fake Picasso. The Debtor's obligation to Sands was secured by a deed of trust on the Property.

The Debtor also had been involved in a dispute with Calvin and Joyce Brack (the Bracks). The Bracks alleged that the Debtor sold them over $1,500,000 in improperly attributed antiques. To settle the matter, the Debtor agreed to repurchase the antiques for the original purchase price. However, the Debtor did not

2

have the funds available to purchase them without a committed buyer. Consequently, the Bracks hold a claim against the Debtor for $1,569,225; the Bracks continue to possess the antiques until the debt is paid.

On April 28, 2011, Sands scheduled a foreclosure on the Property. The same day, the Debtor filed a chapter 11 bankruptcy petition, but the case was dismissed when the Debtor failed to file required schedules and documents. Sands rescheduled the foreclosure to June 30, 2011. The Debtor filed this chapter 11 case on June 20, 2011.

According to the Debtor's bankruptcy schedules, the Inventory was valued at $4,219,045. The Property was listed with a value of $5,000,000 with Sands' secured claim against it in the amount of $2,400,057. The Debtor listed the Bracks and the Internal Revenue Service (IRS), which held a priority tax lien in the amount of $742,810,[2] as her primary creditors. The bulk of the Debtor's other debts were unsecured claims related to unpaid medical bills.[3]

On July 1, 2011, Sands filed a motion for relief from stay in order to foreclose on the Property. Sands alleged that the Property had been appraised for only $1,820,000, and that there

---

[2] The IRS filed an amended proof of claim on July 29, 2011, in the secured amount of $863,864.18 for the 2006 and 2007 tax period. However, by November 2011, the IRS had corrected errors in the Debtor's 2007 tax return and adjusted its claim to $450,025.11.

[3] The Debtor suffered a heart attack in 2005, and has since undergone heart surgery. She is 71 years old and in relatively poor health.

3

were 16 liens (mostly tax liens) against the Property totaling over $1,000,000.[4] Sands' unopposed motion was granted, and on July 28, 2011, Sands foreclosed on the Property.

On July 27, 2011, a representative from the Office of the United States Trustee (UST) conducted a site visit of the Property. He reviewed the Debtor's books and records and discussed the Debtor's lack of compliance with UST requirements for debtors-in-possession, including providing copies of insurance declarations for all policies covering the Property and the Inventory. He further noted that the Debtor appeared to be in poor health and raised the issue of whether a trustee should be appointed in the case. Later that day, the Debtor's attorney agreed to the appointment of a trustee. The bankruptcy court approved the parties' stipulation; Jason Rund was appointed as the chapter 11 bankruptcy trustee (Trustee) on August 4, 2011.

The following day, the Trustee inspected the Property. He brought with him an antiques auctioneer to look at the Inventory and offer a preliminary assessment of its value and condition. The auctioneer estimated that the value of the Inventory was between $700,000 and $1,000,000, significantly less than the value attributed to it by the Debtor. On August 9, 2011, the Trustee inspected the Property again, bringing a second antiques auctioneer to assess the Inventory. The second auctioneer made an initial valuation of the Inventory in excess of $1,000,000, however, both auctioneers emphasized that a full assessment could

---

[4] Although never submitted to the bankruptcy court, the record on appeal reveals that the Debtor had the Property appraised in July 2011, for $2,650,000.

4

only be made once the Inventory was removed from the Property, itemized and inspected.

On August 8, 2011, the Trustee filed a motion to convert the Debtor's case from chapter 11 to chapter 7 (Conversion Motion). The Trustee also filed, the same day, an ex-parte application for an order shortening time for a hearing on the Conversion Motion.

The Trustee contended that the Property had been foreclosed on by Sands and that the business was not operating – nor could it operate since Sands was proceeding to evict the Debtor from the Property. He asserted that the only foreseeable outcome in the case was an orderly liquidation of the Inventory. The Trustee argued that liquidation would be more efficient and beneficial to the creditors of the estate under chapter 7 because it would (1) save the cost of the plan confirmation process, and (2) allow for the subordination of the IRS's tax lien in favor of the estate's creditors pursuant to § 724(b).

The Trustee also sought conversion because he was concerned the Inventory could be damaged or disappear if not liquidated promptly. He noted that once removed to an auction house, the Inventory would be secure and insured, which was not otherwise the case. The bankruptcy court granted the ex-parte application on August 9, 2011, and a hearing was set for August 24, 2011 (Hearing Date).

On August 11, 2011, the Trustee filed a motion for turnover of the Inventory and to remove the Debtor from the Property (Turnover Motion). Also the same day, the Trustee filed an ex-parte application to hear the motion on shortened time. The Trustee made similar arguments to those made in the Conversion

5

Motion. He contended that due to the foreclosure, there was an enhanced risk of damage or disappearance of the Inventory, for which the Debtor had not provided proof of insurance. The Trustee sought access and turnover of the Inventory to move it to a location where it could be held, evaluated, and auctioned. The Trustee also requested the bankruptcy court to order the Debtor to vacate the Property, using the U.S. Marshals Service to assist with eviction if necessary.

The bankruptcy court granted the Trustee's ex-parte application to expedite the hearing on the Turnover Motion, setting it for the Hearing Date.

On August 23, 2011, the Debtor's current attorney was substituted for her previous attorney. Also on that date, the bankruptcy court posted a tentative ruling on the Conversion Motion and the Turnover Motion, which was sent to the parties the following day. In the tentative ruling, the bankruptcy court determined that the IRS had not been properly served with the motions and continued the Hearing Date to September 7, 2011, providing that any objections to the motions be submitted by August 31, 2011.

Crossing paths with the bankruptcy court's decision to continue the Hearing Date was the Debtor's August 24, 2011, ex-parte application and motion to continue the Hearing Date (Motion to Continue). The Debtor asserted that her previous attorney did not notify her of the Conversion Motion or even counsel her on the ramifications of filing bankruptcy and the requirements of chapter 11. Therefore, she requested a 30-day continuance of the Hearing Date in order to fully respond to the Trustee's

6

contentions. The Debtor contended that the Trustee's assessment of the Inventory's value was grossly inaccurate and requested time to demonstrate the true value of the Inventory.

The bankruptcy court entered an order denying the Motion to Continue on August 29, 2011. On August 31, 2011, the Debtor filed an opposition to the Conversion Motion. She did not file an opposition to the Turnover Motion.

The Debtor argued against conversion on the basis that her creditors would receive a greater payout if she were able to liquidate the Inventory through the structure of her design business rather than through an auction. The Debtor also argued there was no cause to convert the case because her business was operating and was not dependent on the Property, and because she had the assets and future project commitments to successfully reorganize. She supplied an "Inventory List" cataloging the various items in her collection totaling over $6,000,000 to demonstrate that the Trustee severely underestimated the value of the Inventory.

Alternatively, the Debtor requested dismissal of her case on the basis that her debts were less than what had been scheduled, negating the need for bankruptcy relief. She submitted a declaration from her accountant stating that after corrections to the Debtor's 2007 tax returns and negotiations with the IRS, her tax obligation could be significantly reduced. Furthermore, the Debtor alleged that the debt to Sands had already been extinguished.[5]

_____

[5] The Debtor alleged the market value of the de Kooning
(continued...)

7

Just prior to the September 7, 2011 hearing, the bankruptcy court issued a ten-page written tentative ruling indicating that the Conversion Motion would be granted and the Turnover Motion partially granted (Tentative Ruling). The bankruptcy court determined that there was a substantial or continuing loss to or diminution of the estate because the Property had been lost to foreclosure and, furthermore, given the value of the Inventory (as stated by the Trustee and the auctioneers) and the amount of the IRS's claim, the IRS could seek relief from the stay and gain possession of the Debtor's personal property, including the Inventory.

The bankruptcy court also determined that the Debtor failed to provide admissible evidence establishing her ability to rehabilitate or reorganize. As a result, the bankruptcy court found that cause existed to convert the Debtor's chapter 11 case to chapter 7. It further found that it was in the best interest of creditors to convert the case because the IRS's tax lien could be subordinated in a chapter 7. Finally, the bankruptcy court agreed with the Trustee that the Inventory should be turned over to an auction house so that it could be secure, insured, and assessed. However, it declined to order the U.S. Marshals Service to force the Debtor to vacate the Property.

The hearing on the Conversion Motion and the Turnover Motion

[5](...continued)
painting was $4,000,000-$7,000,000 and could "fetch a price significantly above $11 million." She alleged she had the right, for a limited time, to sell the painting, which was disregarded by Sands, who sold it for $350,000. The Debtor therefore alleged that if Sands had not breached their agreement, the debt to him would have been satisfied.

8

was held on September 7, 2011. At the close of the hearing, the bankruptcy court announced that it would adopt its Tentative Ruling. Before a final order was entered, the Debtor filed a motion for reconsideration (Reconsideration Motion). The Reconsideration Motion was filed September 14, 2011, along with an ex-parte application to have the motion considered on shortened time.

In the Reconsideration Motion, the Debtor asserted that she had new evidence to establish that her business could reorganize, including letters from clients substantiating future business commitments and letters demonstrating the ability to rent alternative warehouse space for the business. The bankruptcy court denied the Reconsideration Motion on September 20, 2011. Also on that date, the bankruptcy court entered the final orders on the Conversion Motion and the Turnover Motion. The Debtor filed this timely appeal.[6]

_____

[6] The Debtor's notice of appeal (NOA) stated that the order being appealed was the "Debtor's Motion to Reconsider and Vacate Court's Order granting Trustee's Motion in part to Convert Case Under Chapter 11 of the Bankruptcy Code to Case Under Chapter 7 of the Bankruptcy Code and Trustee's Motion (a) Turnover of Certain Items of Personal Property and (b) to Remove Debtor." Attached to the NOA was the Order Denying Motion to Reconsider and the bankruptcy court's order granting, in part, the Turnover Motion. An Amended NOA was filed October 5, 2011, but it was the same as the NOA.
We construe the NOA as an appeal of the bankruptcy court's decision to convert the case because the Debtor never filed an objection to the Turnover Motion in the bankruptcy court. Moreover, the arguments made by the Debtor in the Reconsideration Motion challenged only the conversion. Furthermore, she does not address the Turnover Motion in her appellate brief. Accordingly, she has waived any argument that the bankruptcy court abused its discretion in granting in part the Turnover Motion, and we do not
(continued...)

9

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(A) and § 1334(b). We have jurisdiction under 28 U.S.C. § 158(a)(3).

## III. ISSUES

Did the bankruptcy court abuse its discretion in converting the Debtor's chapter 11 case to chapter 7?

Did the bankruptcy court abuse its discretion in denying the Reconsideration Motion?

## IV. STANDARDS OF REVIEW

The bankruptcy court's decision to convert a chapter 11 case to chapter 7 is reviewed for an abuse of discretion. Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities), 264 F.3d 803, 806 (9th Cir. 2001); Johnston v. JEM Dev. Co. (In re Johnston), 149 B.R. 158, 160 (9th Cir. BAP 1992). A trial court's decision to deny a continuance is reviewed for abuse of discretion. Orr v. Bank of Am., 285 F.3d 764, 783 (9th Cir. 2002). Additionally, the bankruptcy court's denial of a motion for reconsideration is reviewed for an abuse of discretion. Arrow Elec., Inc. v. Justus (In re Kaypro), 218 F.3d 1070, 1073 (9th Cir. 2000); Sewell v. MGF Funding, Inc. (In re Sewell), 345 B.R. 174, 178 (9th Cir. BAP 2006).

Under the abuse of discretion standard of review, we first determine de novo whether the bankruptcy court identified the

[6](...continued) address the merits of that order in this Memorandum. Captain Blythers, Inc. v. Thompson (In re Captain Blythers, Inc.), 311 B.R. 530, 539 (9th Cir. BAP 2004) (issue not adequately addressed on appeal is deemed abandoned).

10

correct legal rule to apply to the relief requested. <u>United States v. Hinkson</u>, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." <u>Id.</u> (internal quotation marks omitted).

## V. DISCUSSION

**A. Conversion Motion**

### 1. There Must Be Cause To Convert

The statutory authority for conversion of a chapter 11 bankruptcy case is found in § 1112(b), which provides that the bankruptcy court shall convert or dismiss a case, whichever is in the best interests of creditors and the estate, for cause.[7] 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) describes what constitutes cause. However, the enumerated "causes" are not exhaustive, and "the court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." <u>In re Consol. Pioneer Mortg. Entities</u>, 248 B.R. at 375. Thus, the bankruptcy court has

---

[7] Section 1112(b)(1) provides:
Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11

wide discretion in determining what constitutes cause adequate for conversion under § 1112(b).  Id.; Chu v. Syntron Bioresearch, Inc. (In re Chu), 253 B.R. 92, 95 (S.D. Cal. 2000); Greenfield Drive Storage Park v. Calif. Para-Prof'l Servs., Inc. (In re Greenfield Drive Storage Park), 207 B.R. 913, 916 (9th Cir. BAP 1997).

Here, the bankruptcy court found that cause existed due to the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b)(4)(A).  Both elements must be met.  The bankruptcy court found there was substantial loss to the estate because the Property, a scheduled $5,000,000 asset, had been lost to foreclosure and that "[d]epending on the actual value of Debtor's personal property, the IRS may have a right to relief from the stay to gain possession of the [Inventory]."  Tentative Ruling at 5.

In making its decision, the bankruptcy court accorded the Debtor's valuation of the Inventory no weight.  It found that the Debtor's valuation of the Inventory was not credible given her admission in the criminal case of misrepresenting the value of antiques in her collection.  We give special deference to a trial court's credibility determinations.  Rule 8013; Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).  In any event, the Debtor's evidence of the value of the Inventory was weak. She provided only her own statement of the Inventory's value and a print-out, which listed the individual items comprising the Inventory with an asserted total value of $6,000,000.

Although it was clear that the Inventory was the most

12

significant remaining asset of the Debtor's bankruptcy estate, and that any full appraisal of the Inventory required a fair amount of time, the Debtor did not take steps to value the Inventory prior to the Conversion Motion. Nor did the Debtor provide information from a third party who may have offered a limited assessment of the Inventory's value or offered a limited assessment or appraisal as to any particular pieces that the Debtor believed had been significantly underestimated by the Trustee's auctioneers. Furthermore, the Debtor's contention that the Inventory was worth over $6,000,000 was inconsistent with the Debtor's bankruptcy schedules, which, two months earlier, valued the Inventory at $4,200,000.

The bankruptcy court found that past sales of antique pieces were of little use in assessing the value of the current Inventory. The bankruptcy court was presented with rough estimates from two auctioneers and the Debtor's unsupported statement regarding the value of the Inventory. We find no abuse of discretion in the bankruptcy court's adoption of the Trustee's evidence of the Inventory's value, especially in light of the bankruptcy court's determination that the Debtor's opinions of value were not credible. See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Furthermore, the bankruptcy court found that it was speculation on the part of the Debtor that the tax liability would be significantly reduced. The Debtor submitted a declaration from her accountant stating that errors for the 2006 and 2007 tax periods were recently corrected and that the

13

accountant believed the Debtor's tax obligation could be reduced to between $50,000 and $375,000. But there was no documentation demonstrating the corrected liability figures or corresponding documentation provided by the IRS that indicated it would contemplate negotiating a reduction in the tax liability.

Because the auctioneers' assessment of the Inventory's value was as low as $700,000, the bankruptcy court was concerned that the IRS could successfully exercise its rights to the Inventory, and the estate would lose the asset. Accordingly, the bankruptcy court found there was substantial or continuing loss or diminution of the estate due to the loss of the Property and the potential loss of the Inventory. Given the facts in the record, that finding was not clearly erroneous.

Section 1112(b)(4)(A) also requires the bankruptcy court to find that there is an absence of a reasonable likelihood of rehabilitation. The issue of rehabilitation for purposes of § 1112(b)(4)(A) "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Wallace, 2010 WL 378351 at *4 (Bankr. D. Idaho Jan. 26, 2010).

The bankruptcy court determined that it was "highly unlikely" that the Debtor would be able to continue to buy and sell antiques given the loss of the Property. Our review of the record supports the bankruptcy court's finding that there was little likelihood that the Debtor could reorganize her business.

The record shows that the Debtor lacked the income and sales to demonstrate a reasonable likelihood of rehabilitation. For

14

example, the Debtor's evidence regarding her ability to rehabilitate her business included her declaration, which stated:

> My business is not dependant upon the [Property]. Truly, I do not want to move but if forced to move that does not mean my business cannot continue. If my merchandise is not liquidated but rather I am allowed to continue my business in another location, I believe my business can survive and thrive.
>
> I say this because during the [sic] 2009 and 2010 while I was recuperating from my heart surgery, my income was approximately $100,000.00 per year. . . . Given that my health has improved I anticipate that if allowed to continue selling my merchandise I will be able to earn significantly more than $100,000.00 per year.

Declaration of Tatiana Khan, August 31, 2011 at ¶ 15, 16.

Again, in her opening brief on appeal, the Debtor argues that her business has "rebounded to their prior levels" after "taking a hit from the economic recession." However, the documents submitted by the Debtor with her declaration indicate that while the Debtor had gross sales of $4,062,558 and income of $446,390 in 2006, and gross sales of $1,101,318 and income of $212,282 in 2007 (even after suffering her heart attack), her gross sales dropped to $82,323 with an income of $63,877 in 2009; and, slid even further in 2010, with gross sales of only $55,000 and income of $50,040.

The Debtor asserted that she had clients who had committed to design projects that would generate between $1,700,000 and $2,200,000 in revenue in the coming year, but there was no independent evidence such as declarations from the clients to substantiate the design commitments.[8] The Debtor also did not present evidence to demonstrate that she could afford to rent or

---

[8] The Debtor alleged that her clientele demanded anonymity.

15

move the Inventory and her business to another location. She only presented evidence establishing that a warehouse space might be available to her. Accordingly, the bankruptcy court's finding that the Debtor's rehabilitation was unlikely was not clearly erroneous. Therefore, we conclude that the bankruptcy court did not err in finding that cause existed to warrant conversion or dismissal pursuant to § 1112(b)(4)(A).

Moreover, there is a separate basis in the record to support the bankruptcy court's determination that cause existed. The Debtor's Schedule J indicates that she has no expenses for insurance. She did not provide the Trustee with any documentation indicating that the Property or the Inventory was insured. Section 1112(b)(4)(C) provides that cause for conversion exists when the debtor fails to maintain appropriate insurance that poses a risk to the estate. Indeed, one of the reasons the Trustee sought turnover of the Inventory was to ensure its removal to an auction house that could provide storage, security and insurance.

2. <u>Conversion Requires An Absence Of Unusual Circumstances And That It Be In The Best Interests Of Creditors</u>

Once a bankruptcy court determines that there is cause to convert or dismiss, it must also: (1) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and, (2) identify whether there are unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors

16

and the estate.[9]  11 U.S.C. § 1112(b)(1), (b)(2); In re Prod. Int'l Co., 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).

The Debtor contended that if the Debtor could continue her business of selling the Inventory to clients, creditors would receive greater payment on their claims than they would under a quick liquidation of the Inventory by the Trustee.  Additionally, she contended that she would lose her livelihood if the case were converted.  However, she never asserted that her reasons against conversion constituted "unusual circumstances" under § 1112(b)(2).  Even if she had, she would also have been required to demonstrate that she could confirm a plan within a reasonable time, and we have already concluded that the bankruptcy court did not err in finding that the Debtor was unable to demonstrate she was ever likely to reorganize or rehabilitate successfully.

The Debtor does not assign error to the bankruptcy court's decision to convert, rather than to dismiss, her bankruptcy case.

---

[9] Section 1112(b)(2) provides:
The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that –
(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) –
        (i) for which there exists a reasonable justification for the act or omission; and
        (ii) that will be cured within a reasonable period of time fixed by the court.

17

Since the Trustee had already been appointed in the case, once cause was established under § 1112(b), the bankruptcy court was not called upon to determine whether the estate's creditors would benefit from keeping the Trustee in place for a proposed liquidation through a chapter 11 plan. It had to simply decide whether to convert or dismiss the case.

To that end, the bankruptcy court correctly noted that it is required to decide what is in the best interests of creditors of the estate, not the best interest of the <u>debtor</u>. <u>See</u> Hr'g Tr. (Sept. 7, 2011) at 21. The Trustee asserted that in his business judgment a liquidation in chapter 7 was preferable to liquidation in chapter 11 because the Trustee would have to propose a plan (or respond to a plan proposed by the Debtor), which would increase administrative expenses and reduce the amount of money available to pay creditors. Significantly, none of the creditors objected to conversion or argued for dismissal. Accordingly, the record supports that conversion was in the best interests of the estate's creditors.

We note, however, that the bankruptcy court did err in determining that § 724 provided a basis for conversion. The bankruptcy court concluded that "in order for unsecured creditors to benefit, the IRS' lien must be subordinated, which is only allowed in a chapter 7 case." Tentative Ruling at 7. Section 724(b) subordinates the interests of tax lienholders to the interests of priority unsecured creditors, but any remaining proceeds are distributed first to junior lien claimants, next to the tax lienholders, and finally, to the debtor's estate. N. Slope Borough v. Barstow (In re Markair, Inc.), 308 F.3d 1057,

1061-62 (9th Cir. 2002); 11 U.S.C. § 724(b)(1)-(6). Therefore, general unsecured creditors are unaffected by § 724(b). Id. at 1064; see also H.R. REP. No. 595, 95th Cong., 1st Sess. 382 (1977). Since the Debtor's schedules revealed a lack of priority unsecured creditors, the tax subordination provision of § 724(b) would not benefit the creditors of the estate. Nevertheless, the bankruptcy court's decision to convert the case is supported by other inferences that can be drawn from the record. Therefore, the bankruptcy court did not abuse its discretion in converting the Debtor's chapter 11 case to chapter 7.

    3.    The Debtor Must Demonstrate She Was Prejudiced By The Denial Of The Motion To Continue

The Debtor's main argument on appeal is that the bankruptcy court's "rush to judgment" prevented the Debtor from defending against conversion of her case. She frames the principal issue in this case as whether a bankruptcy court abuses its discretion when it sets a hearing on a conversion, which "turns on complex valuations," so quickly that the debtor is unable to obtain documentation to present critical evidence in opposition. See Rappaport v. Bittleman (In re Bittleman), 107 B.R. 230, 232 (9th Cir. BAP 1988) (denial of continuance had effect of depriving party of chance to present his case). She asserts that if she had been given a continuance of the Hearing Date, then she could have established that there was no cause to convert the bankruptcy case.

There is no mechanical test for determining when a denial of a continuance is a clear abuse of discretion; it involves a case-by-case analysis. United States v. Kloehn, 620 F.3d 1122,

19

1127 (9th Cir. 2010). Four factors are considered when reviewing denials of requests for continuances: (1) the extent of the appellant's diligence in her efforts to ready her defense prior to the date set for hearing; (2) how likely it is that the need for a continuance could have been met if the continuance had been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party, including its witnesses; and (4) the extent to which the appellant might have suffered harm as a result of the denial of the continuance. United States v. Flynt, 756 F.2d 1352, 1358-59 (9th Cir. 1985). In order to obtain a reversal of the bankruptcy court's denial of the request for continuance, the Debtor must demonstrate that, at a minimum, she suffered prejudice as a result of the denial. Id. at 1359.

The Debtor sought the continuance so that she could provide supporting documentation regarding the value of the Inventory and regarding the reduction in her debts, particularly her debt to the IRS. Additionally, the Debtor argued that she should be allowed time "to explore and present" whether the business could continue at the Property or whether it must move to another location.

Allowing the Debtor additional time so that an expert could conduct an appraisal of the Inventory would not have impacted the bankruptcy court's determination that there was a loss or diminution to the estate and that it was unlikely the Debtor would be able to rehabilitate. Even if the Debtor had been able to have the Inventory appraised at a higher value than that estimated by the Trustee's appraisers, the bankruptcy court

20

determined that there had already been a substantial loss to the estate by the loss of the Property. Moreover, if the Debtor's business was operational, as she contends, she would already have considered and made plans for a new location for the business. Thus, the bankruptcy court's finding that cause existed would not have been altered if the matter had been continued.

Motions for conversion under § 1112(b) are governed by Rule 9014 and Local Rule 9013-1. Local Rule 9013-1(b) provides that motions and hearings are set pursuant to the individual judge's calendaring instructions. Here, the bankruptcy judge requires a minimum of 14 days notice before a hearing can be calendared, with oppositions to be filed 7 days before the hearing. Thus, it is standard practice for a party to have 7 days to oppose a motion. The bankruptcy court continued the Hearing Date for 14 days when it discovered there was a service error. Therefore, the bankruptcy court did not expedite or "[insist] that the trustee's motion to convert be heard on an abbreviated time frame" as the Debtor contends. See, e.g., Appellant's Opening Brief at 2. Part of the reason the bankruptcy court denied the Motion to Continue was that it had provided the Debtor's new attorney the requisite 7 days to file an opposition. Hr'g Tr. (Sept. 7, 2011) at 17. Indeed, the Debtor had 20 days to prepare an opposition.[10]

For these reasons, the Debtor has failed to demonstrate that

---

[10] The original deadline for any opposition to the Conversion Motion was August 11, 2011. After the bankruptcy court continued the Hearing Date to September 7, the deadline to oppose was August 31, 2011.

21

she was prejudiced by the bankruptcy court's denial of the Motion to Continue.

**B.    Reconsideration Motion**

If a motion for reconsideration is filed within 14 days after entry of judgment, it is construed as a motion for relief from judgment under Rule 9023, incorporating Civil Rule 59(e). Am. Ironworks & Erectors, Inc. v. N. Am. Constr. Corp., 248 F.3d 892, 898-99 (9th Cir. 2001); In re Captain Bythers, Inc., 311 B.R. at 539. Although styled as a Civil Rule 60 motion for reconsideration, the Debtor filed it, along with a request for the motion to be considered on shortened time, within 14 days of the bankruptcy court's oral ruling on the Conversion Motion and the Turnover Motion.[11] Civil Rule 59(e) permits a court to reconsider and amend a previous order, however, "the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." Kona Enter., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000).

A motion for reconsideration should not be granted absent "highly unusual circumstances," unless the court is presented with: (1) newly discovered evidence, (2) committed clear error, or (3) there is an intervening change in the controlling law. Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009). A Civil Rule 59(e) motion may not be used to raise arguments or present evidence for the first time

_____

[11] The orders granting the Conversion Motion and granting, in part, the Turnover Motion were entered September 20, 2011. The Debtor's Reconsideration Motion was filed September 14, 2011, 7 days after the Hearing.

22

when they could reasonably have been raised earlier in the litigation. Id.

The Debtor did not contend that there had been a change in controlling law. Therefore, the Debtor was required to demonstrate that new evidence established the viability of the Debtor's reorganization or that the bankruptcy court committed clear error in deciding to convert the bankruptcy case.

For evidence to be "newly discovered" for purposes of Civil Rule 59(e), it: (1) must have been discovered after judgment and the movant must have been excusably ignorant of the facts at the time of trial despite due diligence to learn about the facts of the case; (2) the evidence discovered must be of a nature that would probably change the outcome of the case; and (3) the evidence must not be merely cumulative or impeaching. Jones v. Aero/Chem Corp., 921 F.2d 875, 878 (9th Cir. 1990).

The Debtor's new evidence included: (1) a letter from an antiques appraiser stating that it would cost between $25,000-$30,000 to evaluate the Inventory and take at least 3 weeks to complete; (2) handwritten invoices for Inventory pieces that presumably supported the Debtor's contention that she had a design commitment for a spa in San Diego; (3) a letter from a couple stating they "hope that Tatiana Khan will remain available to us, and supply those rare and special pieces which reflect her unique personal taste" as they construct and furnish a new home in New York; (4) a letter from a "loyal customer" of the Debtor stating he anticipates purchasing $500,000-$1,000,000 in furnishings and "hopes the Debtor will be a resource"; and (5) letters from two entities stating that they had warehouse

23

rental space available for $8,000-$10,000 per month.

The bankruptcy court determined that none of this evidence was properly authenticated and admissible, and, even if it was, most of it was not new evidence. The bankruptcy court found that the evidence would not have changed its decision. We agree that the evidence submitted by the Debtor is not considered "new" evidence. For example, the invoices submitted to support the San Diego project were dated prior to the hearing on the Conversion Motion. The letters from the other customers were created after the hearing. In any event, they did not indicate that the projects were firm commitments that would translate to significant revenue for the Debtor. Accordingly, the Debtor did not provide new evidence that established the bankruptcy court's finding of cause under § 1112(b)(4)(A) warranted reconsideration. Consequently, the bankruptcy court did not abuse its discretion in denying the Reconsideration Motion.

## VI.  CONCLUSION

For the foregoing reasons, we AFFIRM.

24